OPINION
{¶ 1} Appellant Nicole K. appeals from a judgment granting permanent custody of her minor children, J.Y. and I.Y., to the Miami County Children's Services Board.[1] Nicole contends that the judgment was not supported by clear and convincing evidence. *Page 2 
 {¶ 2} We conclude that the record contains clear and convincing evidence that an award of permanent custody to MCCSB is in the best interests of J.Y. and I.Y. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In June 2005, MCCSB filed a complaint in the trial court alleging that J.Y. and I.Y. were dependent children due to a risk of possible harm in their current environment. At the time, J.Y., a male, was almost four years of age and his sister, I.Y., was approximately two and a half-years old. J.Y. and I.Y. had a younger sibling, W.K., who had died at the age of five months in April 2005, due to an alleged lethal level of over-the-counter medication in his system. After W.K.'s death, the older children were removed from the home. When they were removed, their mother, Nicole, was under investigation by the police department due to W.K.'s death. In addition, David Y., the father of the surviving children, had alleged substance abuse issues. David did not participate in the proceedings and eventually surrendered his parental rights.
 {¶ 4} The complaint alleged that when J.Y. and I.Y. were placed in MCCSB's custody, drug testing indicated that both children had higher than normal levels of over-the-counter medication in their systems. The complaint further alleged that both J.Y. and I.Y. had speech delays, and that J.Y. had been exhibiting behaviors that included smearing feces, uncontrollable crying, violent outbursts and physical combativeness toward other children, which was generally focused on his sister, I.Y. Finally, paragraph ten of the complaint alleged that:
 {¶ 5} "At this time, there are no other relatives appropriate for these children. *Page 3 
MCCSB feels that it would place J* * * and I* * * at great risk of harm and possibly death should they be returned to the custody of their mother."
 {¶ 6} MCCSB filed a case plan, which required Nicole to provide food, clothing, shelter and medical needs at all times for the children, to obtain and maintain taxable income, to maintain stable housing, to attend parenting classes at the Franklin House, and to complete a psychological evaluation. David was required to complete a drug and alcohol assessment, refrain from using alcohol while having contact with the children, and complete parenting classes. There were also concerns about developmental delays with the children, and the children were to be evaluated on these issues.
 {¶ 7} Nicole and David were granted supervised visitation with the children for approximately two hours per week at MCCSB, with the restriction that neither parent was to be alone with either child.
 {¶ 8} Nicole appeared in court after being served, but David did not appear. The trial court appointed an attorney to represent Nicole and scheduled an adjudicatory hearing for August 2005. The court also granted an interim order of custody to MCCSB pending the adjudicatory hearing.
 {¶ 9} In August 2005, Nicole filed an agreed entry of adjudication, admitting that the allegations in the complaint were true, with the exception of the language in paragraph ten which stated "and possible death." Nicole also admitted in the entry that the children were dependent children as defined in R.C. 2151.04(C). The court, therefore, found that the allegations in the complaint were true, with the exception of the disputed language in paragraph ten. The court found the children to be dependent and scheduled a dispositonal hearing for September 2005. *Page 4 
 {¶ 10} Subsequently, Nicole filed an agreed entry of adjudication in September 2005, again admitting the allegations in the complaint with the exception noted above, and agreeing to an award of temporary custody to MCCSB. The court allowed an amendment to the case plan that gave Nicole two additional hours of visitation due to her completion of services. However, the other visitation restrictions remained in effect. The stated goal at that time was reunification.
 {¶ 11} A review hearing was set for October 2005. An entry was filed at that time indicating that Nicole was making progress. Temporary custody with MCCSB was continued, and a further review hearing was set for December 29, 2005, subject to the findings of the Grand Jury investigation. Nicole filed a motion for change of disposition and return of the children in November 2005.
 {¶ 12} In December 2005, the case plan was amended again to include individual therapy for Nicole, as that had been recommended as the result of her psychological evaluation. MCCSB also filed a response to the motion for return of the children, indicating that Nicole had been indicted for reckless homicide in the death of her youngest child, W.K. Nicole withdrew her motion on December 21, 2005, and asked to vacate the review hearing, based on her plea agreement to one count of negligent homicide. Pursuant to the agreement, Nicole had been sentenced to six months in the Miami County Jail.
 {¶ 13} Nicole entered jail in January 2006, and was released after serving three months, due to her completion of Life Skills classes. She then filed a motion with the trial court in April 2006, asking that her children be returned. At approximately the same time, MCCSB filed a motion for a first extension of temporary custody. This was based *Page 5 
on the children's alleged continuing behavioral problems and need for more services. MCCSB indicated that if the extension were not granted, it would seek permanent custody of the children. Subsequently, in May 2006, MCCSB asked the court to appoint a guardian ad litem for the children, and the court agreed.
 {¶ 14} In June 2006, an agreed entry was filed granting MCCSB a first extension of temporary custody. Nicole was granted a resumption of visitation, as set forth in a prior case plan, and her motion for extended visitation was to remain pending. The court then received reports from the guardian ad litem and a child psychologist in August 2006.
 {¶ 15} At a review hearing held in late August 2006, the court found that Nicole continued to make progress in completing the case plan and that it was in the children's best interest to remain in MCCSB's custody. The court specified that individual therapy would remain part of the case plan until Nicole provided documentation of successful release from therapy. The court also stressed that employment was a part of the case plan, to show that Nicole could provide for the children either through employment or disability benefits.
 {¶ 16} In October 2006, MCCSB filed a motion to change the disposition from temporary to permanent custody. The motion was based on the failure of the parents to attain the goals set out in the case plan, the fact that the children had been in agency care for more than twelve months, and issues of the children's intense behavioral problems, which required constant structure and supervision, and therapeutic care. Evidentiary hearings then took place before a magistrate on three days in May and June 2007. *Page 6 
 {¶ 17} The magistrate filed a decision and entry in July 2007, concluding that the children had been in the custody of MCCSB for a period of twelve or more months in a twenty-two consecutive-month period and that an award of permanent custody to MCCSB was in the best interests of the children. The magistrate concluded that the children's special needs required not just a custodian, but an advocate, to make sure that all the school officials, therapist, and teachers were performing their jobs and that the children were getting the services they needed. The magistrate concluded that Nicole could not be the advocate needed. Nicole did not understand the scope of the children's problems and was in at least partial denial. In addition, Nicole took little initiative until just before the hearing to do something that would provide her with income and allow her to house the children.
 {¶ 18} Nicole filed objections to the magistrate's decision, but the trial court overruled the objections and adopted the decision as the order of the court, in October 2007, stating that the evidence in support of awarding custody to MCCSB was more than clear and convincing. Nicole appeals from the order awarding custody of her children to MCCSB.
 II {¶ 19} Nicole's sole assignment of error is as follows:
 {¶ 20} "THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."
 {¶ 21} Under this assignment of error, Nicole contends that the decision to award permanent custody is not supported by clear and convincing evidence. In particular, *Page 7 
Nicole contends that she presented evidence indicating that she was bonded with her children, that their behavioral problems did not occur until they were placed in foster care, and that she was committed to her case plan.
 {¶ 22} In this case, there is no dispute that the children were in MCCBS's temporary custody for more than twelve months in a consecutive twenty-two month period. In these circumstances, R.C. 2151.414(B) provides that:
 {¶ 23} "(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 24} " * * *
 {¶ 25} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 26} Where children have been in agency custody for the required time, the agency does not have to establish that the child cannot be placed with a parent within a reasonable time or should not be placed with a parent. The only consideration is the child's best interests. In determining the best interests of a child, R.C. 2151.414(D) requires the court to consider:
 {¶ 27} "[A]ll relevant factors, including, but not limited to, the following:
 {¶ 28} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other *Page 8 
person who may significantly affect the child;
 {¶ 29} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 30} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 31} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 32} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 33} A trial court's decision on termination "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." In re A.U., Montgomery App. No. 22264, 2008-Ohio-186, at ¶ 15 (citations omitted). Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact."In re A.J.S., Miami App. No. 2007 CA 2, 2007-Ohio-3433, at ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co., Inc. v. City of Cleveland *Page 9 
(1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 34} After reviewing the entire record, including the hearing transcripts, reports of the guardian ad litem, and the exhibits, we conclude that the trial court's decision is supported by clear and convincing evidence.
 {¶ 35} As a preliminary point, we note that there is no dispute about the fact that R.C. 2151.414(E)(7)-(11) do not apply to this case.
 {¶ 36} R.C. 2151.414(D)(1) concerns the child's relationship with parents, siblings, foster care-givers, and other persons who may significantly affect them. MCCSB originally took the children into temporary custody in May 2005, following the death of their five-month old brother due to multiple drug intoxication. Both J.Y. and I.Y. were tested at the time of their removal and were found to have elevated levels of over-the-counter medication in their systems. J.Y. and I.Y. were initially placed together in a therapeutic foster home, but were separated due to aggressive behavior with each other. In addition, the foster mother, J. M., observed J.Y. engaging in sexual behavior against his sister. J.Y. was then placed in a different therapeutic foster home.
 {¶ 37} Both children continued to exhibit severe behavior and developmental problems while in foster care. I.Y.'s foster mother indicated that I.Y. had poor language skills and slow motor skills. She was hyperactive, had poor sleeping habits, and ate items like human hair, lint, and dog hair. I.Y. also engaged in a "humping" motion on the floor and would have to be verbally prompted to stop. This behavior intensified over time, with I.Y. using objects and her fingers in her crotch area. Her brother, J.Y., also had significant developmental and behavioral issues.
 {¶ 38} In September 2005, MCCSB referred J.Y. and I.Y. to Dr. Ramsey, a child *Page 10 
psychologist and vice president for administration at Dayton Children's Medical Center. Dr. Ramsey's focus is on developmental problems and divorce issues, typically in younger children. Dr. Ramsey evaluated J.Y. and I.Y., and continued to treat them up to the time of the permanent custody hearing in May 2007. He described his initial contact with I.Y. as follows:
 {¶ 39} "When I first met with I* * * she was essentially non-communicative. She was, um, extremely emotional, screaming, yelling, constantly moving. She was exhibiting sexual behavior that was extremely unusual for a child that age. In fact, I have to say in my twenty-eight years of clinical practice, I've rarely seen a youngster so young who was behaving so sexually inappropriate . . . inappropriately. Uh, and even at that very young age, she was developing some ritualistic or what some people might refer to as obsessive-compulsive behavior that gave me great concern, so um, I could not be left alone with her. I asked to [sic] foster parents to always stay with her and then try to engage her in some interactions during that evaluation, but she was, uh, certainly a very, um, difficult child." Transcript of May 23, 2007 hearing, p. 11.
 {¶ 40} Dr. Ramsey indicated that he viewed I.Y. as one of the most seriously disturbed youngsters he had seen. He stated that I.Y. would be an extreme challenge to the most perfect of homes for some time, and that even if placed with the most ideal parents who had superb support from the best professionals, I.Y. would need long-term and intensive care for quite some time and extremely close supervision. At the hearing, Dr. Ramsey said, "I want to emphasize to the Court in the strongest terms, um, that I view I* * * as a walking sexual victim or victimizer and for that reason, whatever home she's in, wherever it would be, issues of supervision are absolutely paramount." Id. at *Page 11 
p. 16.
 {¶ 41} Dr. Ramsey also expressed significant concerns about J.Y. Dr. Ramsey stated that when he first met with J.Y., the child was sleeping only a few hours a night, was scratching at himself, was gibbering or talking incessantly, was extremely hyperactive, was non-compliant, stole food, and smeared feces around the room after a bowel movement. J.Y. had virtually no language, poor judgment, an absolute constant need for attention and supervision, and had been a challenge from a behavioral and educational point as well. Developmentally, he was further behind than his sister. J.Y. was not retarded, but was substantially below average on a developmental and intellectual level. There was also some history of sexually acting out. Dr. Ramsey stressed the severity of the problem and said that J.Y. was essentially non-communicative, was significantly developmentally delayed, and behaviorally and emotionally was a very difficult child to deal with.
 {¶ 42} At the permanent custody hearing, Dr. Ramsey indicated that during foster care, there had been significant improvement in J.Y.'s behavior like the smearing of feces. However, J.Y. still had severe educational needs, needed special attention, and required a home environment where parents were able to consistently apply behavior management strategies to manage his behavior. Dr. Ramsey also stressed that one parent could not provide all the supervision necessary to administer the medication and provide all the attention and follow-up care the children needed. The children's needs were so severe that Dr. Ramsey would not place them together.
 {¶ 43} The children continued to visit together with Nicole on a weekly basis from June 2005, until she was incarcerated in January 2006. I.Y.'s foster parent reported *Page 12 
increased difficulty with I.Y. after her visits with her brother during the summer and fall of 2005. When Nicole was released from jail in April 2006, Dr. Ramsey recommended that the children's contact with their mother should be limited and supervised due to the children's severe behavioral problems. He also recommended that the children should see their mother separately and not visit each other. Dr. Ramsey felt it was not worth the risk, but was open to reviewing his recommendations in the future.
 {¶ 44} In July 2006, the MCCSB caseworker attempted a sibling visit at a park. While there was no aggressiveness or sexual acting out, I.Y.'s behavior regressed after the visit, with increases in problem behavior. In July 2006, MCCSB also referred Nicole and the children to Samaritan Behavioral Health for a Family Interaction Assessment. The purpose of the referral was to see if J.Y. and I.Y. should resume visitation together with their mother as opposed to visiting separately. A clinical counselor, Mary Kelly Jones, met separately with each child and his or her foster parents, met with Nicole, and met with the children together.
 {¶ 45} Jones reported that the children played parallel with each other, not together, and that their interaction was fleeting. At the end of the session with the two children, I.Y. began to sexually act out. I.Y.'s behavior noticeably regressed following the visit and she began engaging in inappropriate behavior that had previously improved, like pulling her hair and eating it, and masturbating. In addition, J.Y. was withdrawn and appeared to be angry at the lack of response from his sister. Jones decided not to schedule a joint meeting with Nicole and the children because she did not feel comfortable bringing the children together again.
 {¶ 46} Nicole indicated to Jones that she had not observed J.Y. and I.Y. having *Page 13 
the type of behavioral problems that MCCSB and the foster parents had seen. Jones testified that Nicole did not seem to understand what would be fully involved with all of the children's appointments and services. Jones did not recommend starting joint visits. She did recommend that Nicole undergo therapy to understand the children's emotional and behavioral issues and to meet their needs.
 {¶ 47} Therapy had already been recommended for Nicole as part of the case plan. Nicole attended therapy sessions between August 2005 and June 2006, when her therapist, Cecilia Caldwell, retired. Caldwell recommended that Nicole continue with therapy, but Nicole made minimal attempts to obtain further therapy. Nicole also failed to provide the court with a release or certification that she had completed therapy, even though the court ordered her to do so. Nicole also did not comply with other goals in the case plan, such as obtaining and maintaining employment, obtaining independent housing for herself and the children, and completing parenting classes regarding the children's special needs. Nicole did obtain a psychological evaluation and was consistent about attending visitation.
 {¶ 48} In October 2006, MCCSB filed a motion to change the disposition to permanent custody. Nicole then received court approval to retain an expert to evaluate J.Y. and I.Y. Nicole's expert, Dr. Morris, met with the children individually twice and with Nicole individually twice. Dr. Morris also observed the children together once and once in a family session with Nicole. Dr. Morris indicated that he had expected to see significantly worse behaviors on the part of the children, based on the reports he had read. He stated that he did not see anything in the children's interaction at the time of his observation to indicate that they should never be reunited. *Page 14 
 {¶ 49} Dr. Morris did indicate that Nicole lacked a complete understanding of the real issues affecting the children and that there was some denial or unrealistic perception of the children. He did not have an opinion regarding Nicole's appropriateness or whether she could provide long-term care for the children.
 {¶ 50} Dr. Morris did not follow up with the foster-care parents to see what the children's reaction was to the joint visit. However, I.Y.'s response afterward was again negative, with more masturbation, aggression, and acting out. Both I.Y. and J.Y. were described by their foster parents as being extremely demanding and exhausting children to care for. In fact, about six weeks before the permanent custody hearing, I.Y. was transferred to another foster home from the home of the foster parents who had cared for her for two years. This was due to the overwhelming nature of I.Y.'s behavior, appointments, and care. Likewise, J.Y.'s therapeutic foster mother testified that there were times she did not know if she could continue to care for J.Y. because he was so demanding and needed her complete attention all the time.[2]
 {¶ 51} In addition to Dr. Morris, Nicole presented testimony at the hearing from Cecilia Caldwell, who expressed the opinion that Nicole was not a threat to her children and had the ability to provide for high needs children. Caldwell did indicate that she had only observed Nicole deal with her children on one occasion when their behavior was unremarkable, and that she had never treated the children and was unaware of their needs.
 {¶ 52} Nicole also presented testimony from her mother's boyfriend, who said *Page 15 
that Nicole was a good parent and that he had never noticed the children having any speech delays or behavior problems before they were removed. Likewise, Nicole claimed that she had never observed any acting out behavior by her children from the time they were born. However, she did admit that she was experiencing generally aggressive behavior by J.Y. before he was removed, including that he got really angry and out of control, screamed and pushed his sister and argued and fought with other children. She expressed these concerns to a school psychologist before the children were removed.
 {¶ 53} The evidence pertaining to the first factor in R.C. 2151.414(D) clearly and consistently supports the trial court's decision that an award of permanent custody to MCCSB is appropriate. J.Y. and I.Y. have significant needs and there was competent, credible evidence that placement with their mother would not be in their best interests.
 {¶ 54} With regard to the second factor in R.C. 2151.414(D), which is the child's expressed wishes, Nicole argues that the trial court erred because the children were not asked about their wishes. Nicole cites the case of In re Swisher, Franklin App. Nos. 02AP-1408, 02AP-1409, 2003-Ohio-5446, in which the Tenth District Court of Appeals held that a trial court failed to comply with R.C. 2151.414(D) because the record did not contain reliable evidence about the wishes of the children. Id. at ¶ 36-41. Nicole contends the same error occurred here. Specifically, the trial court did not interview J.Y. and I.Y., and they were approximately the same ages as some of the children involved inSwisher.
 {¶ 55} Notably, the court in Swisher commented that the children were "arguably capable of expressing their wishes." Id. at ¶ 37. The court did not conclude that the *Page 16 
children of the specific ages were capable; the court simply remanded the case so that inquiry could be made. However, there was no evidence in Swisher of the type of developmental delays that exist in the present case. Furthermore, the guardian ad litem in Swisher failed to even address the issue of the children's wishes. Id. In contrast, the guardian ad litem in the present case stated that she could not speak with the children about their wishes due to the developmental delays and behavioral issues. The trial court also concluded that the children's desires were not relevant due to the totality of the circumstances, which included their ages at the time of removal and their developmental delays and lack of maturity. These circumstances are well-documented in the record.
 {¶ 56} The third factor in R.C. 2151.414(D) relates to the custodial history, including whether the child has been in the agency's temporary custody for twelve or more months of a consecutive twenty-two month period. There is no dispute about the fact that the children were in MCCSB's custody for the required period of time. The children were removed in May 2005, and were continuously in MCCSB's custody until October 2006, when the motion for permanent custody was filed.
 {¶ 57} The final factor in R.C. 2151.414(D) is the "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Testimony from MCCSB witnesses indicates that the children have severe needs and that they need a legally secure permanent placement in order to address those needs. The testimony also demonstrates that Nicole cannot provide even for her children's basic needs, let alone for their special needs. *Page 17 
 {¶ 58} Nicole contended at the hearing that MCCSB did not give her sufficient assistance in finding employment and did not refer her to job training or GED programs. However, the record indicates that Nicole did very little, if anything, for months to move forward with the case plan goals. She also evidenced a lack of understanding or was in denial about the well-documented severity of the children's needs. Accordingly, the trial court did not err in finding that an award of permanent custody to MCCSB was in the best interests of the children.
 {¶ 59} Nicole's sole assignment of error is overruled.
 III {¶ 60} Nicole's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and DONOVAN, JJ., concur.
[1] For purposes of convenience, we will refer to the parties as Nicole and MCCSB.
[2] Both children had therapeutic foster parents, who are trained to deal with children that have behavioral or medical issues or problems. *Page 1