[Cite as *In re M.L.*, 2013-Ohio-394.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

IN THE MATTER OF:                           :
                                            :           Appellate Case No.   2012-CA-56
M.L. & G.L.                                 :
                                            :           Trial Court Case Nos. S-38539
                                            :                                 S-38886
                                            :
                                            :           (Juvenile Appeal from
                                            :            Common Pleas Court)
                                            :
                                   . . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of February, 2013.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. #0009172, and ELIZABETH ELLIS, Atty. Reg. #0074332, by NATHANIEL R. LUKEN, Atty. Reg. #0087864, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
          Attorneys for Appellee

THOMAS H. HAHN, Atty. Reg. #0086858, Post Office Box 341688, Beavercreek, Ohio 45432
          Attorney for Appellant

. . . . . . . . . . . . .

FAIN, P.J.

{¶ 1}      Appellants Danielle and Michael L. appeal from a judgment granting permanent custody of their minor children, M.L. and G.L. to the Greene County Children's

Services Board.[1] Danielle and Michael contend that the trial court erred in granting custody to GCCSB when GCCSB failed to use diligent efforts to assist them as required by R.C. 2151.414(E). Danielle and Michael further contend that the trial court erred in finding that the children could not be placed with them within a reasonable time.

{¶ 2} We conclude that the record contains sufficient clear and convincing evidence that an award of permanent custody to GCCSB is in the best interests of M.L. and G.L., and that they could not be placed with either parent within a reasonable time. Accordingly, the judgment of the trial court is Affirmed.

## I.  Facts and Course of Proceedings

{¶ 3} GCCSB filed a complaint in July 2006, alleging that M.L. was a dependent child, because her condition and environment warranted the State in assuming her guardianship. The complaint indicated that the agency had been working with the family since July 2005, when M.L. was approximately six months old. The agency had received a report that Michael had been arrested for violating parole due to marijuana and drug paraphernalia in the home. The home was also in disarray, with trash lying around. Michael was on parole due to a charge of gross sexual imposition involving his eight-year old stepdaughter, and had spent several years in prison for the crime. He had also not received any sex offender treatment.

{¶ 4} While Michael was incarcerated for the parole violation, the agency informed him that he would not be permitted to reside with his infant daughter, M.L., until he was

---

[1]For purposes of convenience, we will refer to the parties as Danielle, Michael, GCSSB, and Linda and Daniel G.

assessed at low risk for sexually offending. Danielle made it clear that she had no plans of separating from her husband. A psychologist who assessed Danielle concluded that it was improbable that she would be able to protect M.L. from Michael. Accordingly, when Michael was released in January 2006, from the prison term imposed for the parole violation, M.L. was placed out of the home on a safety plan. M.L. was placed with her maternal grandparents, Linda and Daniel G. Michael also underwent a sexual offender assessment with Rosemary Federle, who felt his potential for re-offending was high.

{¶ 5} In May 2006, Linda G. was hospitalized, and a family friend, Kathy D., stepped in to help, with the proviso that M.L. could only be at the grandparents' home when Daniel G. was present. There were repeated calls of concern to the agency about violations of the plan and about the fact that Danielle and Michael had unsupervised visits. Because of this, M.L. was now living full-time with Kathy D., but Kathy was only willing to provide care for a limited time. The agency, therefore, filed a dependency complaint and asked for interim predispositional orders in July 2006.

{¶ 6} The original caseplan, filed with the court and approved in August 2006, removed Linda and Daniel from the case plan, indicated that M.L. would be residing with Kathy D. full-time, and added parenting classes for Danielle and Michael. The plan further provided that Michael would not reside with M.L. until he was assessed at low risk of re-offending by a qualified sexual offender therapist, and that Danielle and Kathy D. would ensure that Michael was not unsupervised with the child.

{¶ 7} Originally, the court granted GCCSB protective supervision, and ordered the parties to follow the case plan. Shortly thereafter, however, the court granted emergency

temporary custody to GCCSB, based on representations that there were reasonable grounds to believe that M.L. was in danger and that removal was necessary. GCCSB then filed an amended complaint in late August 2006, alleging that the parties were having difficulty following the case plan. As a result, the court granted temporary custody to GCCSB, which had placed M.L. in foster care. The case plan goal was amended to make reunification a goal, and Kathy D. was removed from the plan. Visitation with the parents was restricted to once a week for two hours, with visitation to be supervised at the Greene County Visitation Center. The other case plan requirements stayed essentially the same.

{¶ 8} On December 26, 2006, the court granted GCCSB emergency custody of G.L., a male child who had been born that day. In January 2007, an amended case plan was filed, indicating that the goal was reunification with the parents. M.L. would continue to reside in foster care and G.L. would reside with Linda and Daniel G. The goals were the same as before, with Michael completing sex offender treatment, and visitation with M.L. being restricted to the visitation center. Michael was permitted to visit G.L. at Linda's and Daniel's home, but all contact had to be supervised by the grandparents.

{¶ 9} In March 2007, the magistrate concluded that it was in the children's best interests to give GCCSB temporary custody, due to evaluations from psychologists about Michael's minimization of the behaviors that led to his arrest, and Danielle's belief that Michael did not have inappropriate sexual contact, even though he had pled guilty and had spent five years in prison on the charge. The magistrate also concluded that the grandparents' home was unsuitable because of the amount of clutter and Linda's testimony that she sometimes left the parents and G.L. unsupervised. The case plan still specified reunification

as the goal.

{¶ 10}    In August 2007, the trial court sustained objections to the magistrate's decision, and awarded legal custody of M.L. to the grandparents, Linda and Daniel, and protective supervision to GCCSB.    However, the court subsequently overruled the grandparents' motion to modify visitation and allow Daniel to visit M.L. in their home, after receiving the report of a guardian ad litem, who recommended against modification. The report expressed various concerns, including the grandparents' belief that Michael was not guilty of the sex offense, Michael's failure to complete sex offender treatment, and violations of the rules of the visitation center by both parents.    A magistrate's decision on the subject noted that both parents had testified positive for marijuana after a hearing held in October 2007.

{¶ 11}    In February 2008, both parents consented to having legal custody of G.L. placed with Linda and Daniel, with GCCSB retaining protective supervision.  Between that time and January 2012, Danielle and Michael's situation remained essentially the same. Michael failed to participate in sex offender treatment, other than for a brief period; both parents initially participated in counseling for mental health issues but later terminated treatment; both were unemployed and completely reliant on Linda and Daniel for financial support; on the few occasions when caseworkers were permitted to enter their home, it was observed to be dirty; both parents continued to minimize Michael's sex offense and the risk of further problems; and both parents continued to test positive at times for marijuana.

{¶ 12}    Unfortunately, Linda had health issues that eventually resulted in her placement in a nursing home, and she was removed from the case plan in November 2011.  A

review done around the same time indicated that the children were showing some extreme behaviors and had been referred to counseling. Shortly after Linda died in January 2012, Daniel told GCCSB that he was no longer able to take care of the children. On January 30, 2012, after meeting with GCCSB and other family members, Daniel signed a voluntary agreement placing M.L. and G.L. in GCCSB's custody. The children were then placed in foster care.

{¶ 13} An amended case plan, filed in February 2012, indicated that in addition to Michael's sex offender status, the agency had received reports that Danielle had "perpetrated" on younger family members as a teen. Extended family members had also reported that the children had been behaving in an inappropriate sexual manner with one another, simulating intercourse and oral sex with one another on at least two separate occasions. A complaint was subsequently filed, alleging that the children were both neglected and dependent. An affidavit attached to a motion for predispositional orders stated that the children had disclosed that they had been allowed to spend unsupervised time with their biological parents, which resulted in the children being exposed to sexual activities in their parents' home. The agency asked for temporary custody, and indicated in case plans that it was going to work towards obtaining permanent custody of the children, because Daniel had indicated that he could no longer care for the children.

{¶ 14} Counsel was appointed for Danielle and Michael, and the court also provided a guardian ad litem/court appointed special advocate (GAL/CASA) for the children. In May 2012, GCCSB withdrew its allegation of neglect, and the court allowed Danielle and Michael two hours of visitation time per week, at the Greene County Visitation Center.

{¶ 15}  In late May 2012, the GAL/CASA filed a report, recommending that GCCSB be granted permanent custody.  Before preparing the report, the GAL/CASA had visited both children several times, and had also interviewed Danielle, Michael, Daniel, three other relatives of the children, and a long-time neighbor of Daniel and Linda.  The GAL/CASA reported that both children seemed content with their foster care situation.  Danielle and Michael denied that Michael had done anything wrong in his past.  Michael admitted that he and Danielle could not provide for the children's basic needs at this time.  Daniel, who had spent the most time with the children and their parents, stated that he did not want the children to live with their parents, and that Michael was volatile and should not be around the children.  Both the relatives and Daniel's neighbor expressed concern about the fact that Daniel and Linda had allowed the children to be with their parents without supervision, and about the fact that the children had been out at night, running around, without anyone watching them.

{¶ 16}  In an updated report submitted in late July 2012, the GAL/CASA stated that since M.L. had begun visiting her parents at the visitation center in May 2012, she had begun wetting and soiling herself.  After the first visit with her parents, M.L. also began exhibiting inappropriate sexual behavior against herself and her brother.  The GAL/CASA concluded that any contact with the biological parents was harmful to the children, and again recommended that GCCSB be given permanent custody.  Based on observation of the parents, the GAL/CASA also asked that they be drug-tested.

{¶ 17}  The trial court held a dispositional hearing on July 31, 2012.  Witnesses at the hearing included: Dr. Battle, a clinical psychologist who had prepared three reports evaluating Danielle; April Whalen, a mental health therapist who had diagnosed and treated

M.L. and G.L.; Barb Stamper, the Coordinator of the Greene County Family Visitation and Mediation Center; Beth Pfoutz, a family support caseworker; Rhande R., maternal aunt of the children; Goldie N., Danielle's aunt; Daniel G.; Kathy D.; Michael L.; and Danielle L.

{¶ 18}   Dr. Battle had performed evaluations of Danielle in 2005, 2009, and 2012. According to Dr. Battle, Danielle was currently less able to care for the children than she had been previously, and was not able to provide the care that her children required.  The doctor said that even if Danielle received skilled psychotherapeutic treatment, it would not be sufficient to address her underlying incapacity to put her children's needs first.  Danielle's choice had been to deny that her husband's history as a sex offender was a factor and to not recognize a need to protect her children.  Danielle also had a history of having abandoned her two eldest children, who had a different father.

{¶ 19}   Whalen, the therapist, indicated that M.L. avoided eye contact and became nervous, anxious, or angry when inappropriate sexual contact was discussed.  G.L. was more open, but after he had discussed inappropriate touching and had named names, he refused to talk to the therapist.  G.L. later indicated to the therapist that his sister, M.L., had been telling him not to talk to her.  The therapist read a book to G.L. and discussed inappropriate touching.  G.L. then identified various individuals who had touched his private parts, including his sister, M.L., Michael, Daniel, and another boy.

{¶ 20}   After visitation began with the parents in May 2012, M.L.'s defiant behaviors increased, and she had started inappropriate touching with her brother again.  This had been present when the children went into foster care and had been decreasing, but had started up again.  M.L. told the therapist that she had found an anti-wrinkle type of thing that vibrated,

and that she had gone into the bathroom and pulled her pants down. She reported that her father had something like that.

{¶ 21} Stamper, the visitation center coordinator, testified that visitation had been monitored at all times, and that Michael had signed off on a policy they have for sexual abuse. This policy requires an offender to limit physical contact with the children, to redirect the children, because children do not always understand the limitations, and to redirect physical contact at an appropriate time, i.e., the offender should not keep prolonged time in physical contact. Michael had not always followed the policy and had to be redirected several times by staff. On one occasion, Stamper allowed contact to happen to see if Michael would redirect it, but he failed to do so for ten to fifteen minutes. This problem had been an issue through all the visitations. At times, Danielle had stepped in to tell Michael he should not do something, but she did not do this every time.

{¶ 22} Pfoutz, the GCCSB caseworker, testified that May 24, 2012, was the first time Danielle had ever allowed her into two rooms of her home. The kitchen was extremely cluttered, with little bare space on the counters or the floor. There were paths so Danielle and Michael could walk around their belongings in both the kitchen and living room, which they had converted into their bedroom. The clutter, depending on where it was, was from 18 to 24 inches tall, with the paths being about 18 inches wide. The residence also had a strong odor. Danielle indicated that some of the utilities had been turned off.

{¶ 23} Pfoutz also saw two steel pipes, with steel bowls, lying on a box next to the mattress. Pfoutz testified that these pipes are items that, in her experience, are used for drugs. Accordingly, she asked the court to have the parents tested for drugs at the hearing. The

court ordered a drug screen, and both parents tested positive that day for marijuana.

{¶ 24}   Pfoutz indicated that the parents were not on the case plan during her involvement.  At the beginning of the case in 2005, GCCSB had attempted to work with the biological parents, but was not successful.  After the court granted legal custody to the grandparents, the parents were removed from the plan, and the focus was on maintaining the children in their grandparents' care.  By the time Daniel relinquished custody in January 2012, the children had been in the grandparents' custody for five years, and if GCCSB were to do a case plan, reunification with Danielle, as long as she was married to and residing with Michael, would automatically equate with reunification with Michael, who is a sex offender.  Pfoutz also testified that Danielle had been counseled many times about the fact that if she chose to stay with her spouse, she risked having her children not come home.

{¶ 25}   When Pfoutz met with Daniel, other relatives, and Michael in January 2012 to discuss Daniel's relinquishment of custody, Michael became extremely angry very quickly, and began yelling and cussing and hitting walls.  He eventually stormed out of the room, saying he wished they were all dead.  The house was locked, and after Michael returned, he banged on the door and yelled, resulting in the authorities having to be called.

{¶ 26}   Pfoutz also testified that Michael has mood swings and can be explosive or can be very pleasant.  She noted that she wanted to follow up on the drug use issue, but was told not to follow through with that because the parents were not on the case plan.  Pfoutz observed erratic behaviors, mood swings, and a deterioration in personal hygiene and upkeep over the years that could stem from mental health issues or drugs.  Pfoutz testified that no one else in the family was able to take custody of the children, and that giving the agency

permanent custody was in the children's best interests.

{¶ 27} Danielle's maternal aunt and her half-sister also testified. They both indicated that they had many concerns about the children being in Danielle's and Michael's care, and that even when the children were with Linda and Daniel, the children were not properly taken care of, were allowed to be around their parents unsupervised, and did not receive proper attention from their parents. The maternal aunt, who had lived across the street from Linda and Daniel since 1988, testified that she had seen the children being touched inappropriately, with hands going high on the legs and rubbing bodies all over each other.

{¶ 28} Daniel G. testified during the parents' case, and stated that he had never allowed Michael to be around the children unsupervised. He also said that he had never seen Michael do anything inappropriate.[2] Daniel did work, however, and indicated he would not know if Michael or Danielle were unsupervised during those times. He did say that he had told the GAL/CASA that Michael is volatile and should not be around children. In addition, the house Michael and Danielle lived in was one he had purchased, and they had not paid anything to live there. Sometimes they had no electric service or water, and it was not a place for the children. Prior to Daniel's wife's death, Daniel and his wife had financially supported Danielle and Michael, but Daniel could not afford to do so any longer. Daniel indicated that he had never considered allowing Danielle and Michael to move into his house and help raise the children, because even with supervision, they could not do it. He stated that he thought the children needed to be with GCCSB.

---

[2]This is in contrast with G.L.'s statements to the therapist. G.L. stated that when he told his grandfather, Daniel, that Michael had touched him, his grandfather threw his father out of the house.

**{¶ 29}** Both Danielle and Michael testified about hoping to get money from settling an automobile accident case, but they were vague on the details and contradicted each other. For example, Michael testified that the lawyer would not talk to them, and that no demand for settlement had been made. In contrast, Danielle stated that she had talked to the lawyer a few days ago, and that he said they were waiting on the check. However, she had no idea as to the amount of the settlement, and no documents were offered to prove that any such offer existed. They both had also applied for social security disability benefits, but their claims had been denied. Neither had been employed for years. Both parents acknowledged that they were not in a position to provide for the children, but wished to be given an opportunity to try.

**{¶ 30}** Both parents also denied having used illegal drugs (or in Michael's case, he denied having used drugs for at least two months). However, both tested positive for marijuana on the day that the permanent custody hearing was held.

**{¶ 31}** Finally, Kathy D., a family friend, testified that she believed Michael and Danielle could meet their children's needs, with her help, if they obtained appropriate housing. Kathy D. indicated that she was not concerned with the fact that Michael was a registered sex offender, and that she had never seen him do anything inappropriate with the children.

**{¶ 32}** After hearing the testimony, the trial court filed a decision in August 2012, granting permanent custody of M.L. and G.L. to GCCSB. Danielle and Michael appeal from the judgment of the trial court.

### II. GCCSB Did Not Fail to Use Diligent Efforts to Assist the Parents

**{¶ 33}** Danielle's and Michael's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN GRANTING CUSTODY TO GREENE COUNTY CHILDREN'S SERVICES BOARD ("CSB") WHEN CSB FAILED TO USE DILIGENT EFFORTS TO ASSIST THE PARENTS AS REQUIRED BY R.C. 2151.414(E).

{¶ 34} Under this assignment of error, Danielle and Michael acknowledge that R.C. 2151.414(E)(7)(d) does not require an agency to show by clear and convincing evidence that it made diligent efforts to assist a parent to remedy the problems that caused the child to be placed outside the home, where the parent has been found guilty or has pled guilty to gross sexual imposition. Danielle and Michael contend, however, that Danielle was not convicted of the offense, that she has been diligent in being active in her children's lives, and that GCCSB has not shown by clear and convincing evidence how she would not be able to provide for her children. They also argue that GCCSB failed to make diligent efforts to assist Danielle.

{¶ 35} "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that (1) granting permanent custody of the child to the agency is in the best interest of the child and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re K.M.*, 8th Dist. Cuyahoga

No. 98545, 2012-Ohio-6010, ¶ 8, citing R.C. 2151.414(B)(1).

{¶ 36} In the case before us, the trial court concluded that granting permanent custody was in the best interests of M.L. and G.L., and that the children could not be placed with either parent within a reasonable period of time. R.C. 2151.414(E) provides a list of fifteen factors to be considered, in addition to R.C. 2151.414(E)(16), which includes "[a]ny other factor the court considers relevant." However, the court must only find one or more factors with regard to each parent; it need not find that all factors apply. Accordingly, the trial court did not have to find that the agency made diligent efforts to assist the parents, if one or more of the other factors in R.C. 2151.414(E) justify termination of parental rights.

{¶ 37} The trial court made twelve findings of fact, which relate to the following factors in R.C. 2151.414(E): (1) the parents continuously and repeatedly failed to substantially remedy the conditions causing the child to be placed outside the home, despite "reasonable case planning and diligent efforts by the agency to assist the parents"; (2) the parent's chronic mental or emotional illness or chemical dependency "is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * * "; (3) "The parent has demonstrated a lack of commitment toward the child by failing to   regularly support * * * the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child"; (4) a parent has been convicted or has pled guilty to an offense under R.C. 2907.05, and "the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense"; (5) a "parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child

or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect"; and (6) a "parent has committed abuse as described in section 2151.031 of the Revised Code against the child * * and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse * * * makes the child's placement with the child's parent a threat to the child's safety." These items pertain, respectively, to R.C. 2151.414(E)(1), (2), (4), 7(d), (14), and (15).[3]

{¶ 38} The trial court's findings of fact specifically refer to GCCSB's continuous involvement with the family for several years; Michael's conviction for gross sexual imposition in 1997, in connection with his eight-year old daughter from a previous marriage; Danielle's inability to recognize Michael's prior sexual offending as a concern for the children's safety; the fact that not even "skilled psychological treatment for an extended period would be sufficient to address [Danielle's] underlying incapacity to put the needs of her children first"; the fact that "both the children and their parents engage in a pretense of positive relationship, but that there is actually no genuine concern or bond"; statements made by G.L. and M.L. in therapy, and symptoms that indicate they have been the subject of sexual abuse or victimization; the children's expressed desire to live with their grandfather (who is unavailable) or foster parents, not their biological parents; the parents' lack of employment for many years; the parents' complete financial dependence on Danielle's parents for many years, which dependence could no longer be sustained; the lack of running water in a house that is

---

[3] The abuse referred to in R.C. 2151.414 includes abuse described in R.C. 2151.031, which defines an "abused child" as one who "is the victim of 'sexual activity' as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child * * * ." R.C. 2151.031(A).

"falling apart"; the parents' positive tests for illegal drug use, even at the time of the permanent custody hearing; and Michael's volatile temper and mood swings, which place the children's safety at risk. Because these matters clearly and convincingly support termination of parental rights under R.C. 2151.141(E)(2), (4), (7)(d), (14), and (15), GCCSB did not have to establish that it made diligent efforts to assist the parents under R.C. 2151.141(E)(1).

{¶ 39} Although Danielle and Michael have not presented a manifest weight challenge, we have noted even in that context, that:

A trial court's decision on termination "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re A.U.*, Montgomery App. No. 22264, 2008-Ohio-186, at ¶ 15 (citations omitted). Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, Miami App. No.2007 CA 2, 2007-Ohio-3433, at ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. *In re J.Y.*, 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33.

{¶ 40} Our review of the record, transcript, and exhibits indicates that there is competent, credible evidence that would allow the trial court to conclude that the statutory

elements for termination under R.C. 2151.414(B)(1)(a) and (E) have been satisfied with regard to both parents. The trial court made it clear in its decision that it did not believe the parents or their witnesses, and that was within the court's purview, since the court had the opportunity to view the witnesses and observe their demeanor.

{¶ 41} Accordingly, the First Assignment of Error is overruled.

### III. The Trial Court Did Not Err in Finding that the Children Could Not be Placed with the Parents within a Reasonable Time

{¶ 42} Danielle's and Michael's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN COULD NOT BE PLACED WITH THE PARENTS WITHIN A REASONABLE TIME.

{¶ 43} Under this assignment of error, Danielle and Michael challenge the testimony of the psychologist, Dr. Battle, who rendered an opinion that Danielle could not be treated and counseled to the point that she could provide adequate care for her children. They note that the doctor only spent two hours with Danielle, and that Danielle had reason to be depressed, given the recent loss of her mother and the prospect of losing her children. They also stress that Dr. Battle did not explain how Michael would still be a threat to the children.

{¶ 44} We disagree with this representation of the facts. Dr. Battle had prepared three reports based on her evaluations of Danielle: one in 2005; one in 2009; and one in 2012. The past evaluations, as well as the 2012 evaluation, included psychological testing. While Dr. Battle indicated that Danielle's depression was understandable, her concern about Danielle's ability to provide care for the children was not based on the fact that Danielle may

have been depressed. Dr. Battle's opinion that Danielle was even less able to care for her children than in the past was based, in part, on the fact that Danielle previously had a good support system, and now did not. Furthermore, Dr. Battle stressed that despite improvement in Danielle's depression in 2009, her parenting ability had never improved.

{¶ 45} In addition, Dr. Battle expressed significant concern about Danielle's ability to protect the children. This was based on the fact that Danielle's denial of the problem posed by Michael's status as a sex offender prevented her from taking necessary steps to formulate a plan that would provide protection for the children. As noted previously, Dr. Battle stated that this would not change, even with skilled psychotherapeutic treatment, due to Danielle's underlying inability to put the needs of her children first.

{¶ 46} Dr. Battle's failure to have interviewed Michael does not render her opinions unworthy of belief. Dr. Battle indicated in her testimony that she had independent knowledge of the victim and the circumstances surrounding Michael's sexual abuse case. Had this knowledge been favorable to Michael, the doctor would have said so, or would have factored it into her opinion. Furthermore, the record contains substantial evidence supporting the conclusion that Michael is a threat to the children, including the fact that Michael and Danielle continued to minimize his past actions, that G.L. reported that he had been inappropriately touched by his father, that M.L. reported having been exposed to inappropriate sexual items at her parents' home, that both children showed signs of sexual abuse or victimization; and that these signs increased or resurfaced in M.L. following visitation with her parents.

{¶ 47} Accordingly, the trial court did not err in concluding that M.L. and G.L. could not be placed with their parents within a reasonable time. The Second Assignment of

Error is overruled.

## IV.  Conclusion

{¶ 48}   Both of Danielle's and Michael's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Stephen K. Haller / Elizabeth Ellis
Nathaniel R. Luken
Thomas H. Hahn
Hon. Robert W. Hutcheson