[Cite as *In re L.J.*, 2016-Ohio-2658.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| L.J. and M.J. | : | C.A. CASE NO.   2015-CA-85 |
| | : | |
| | : | T.C. NO. 2014-534 and 2014-535 |
| | : | |
| | : | (Civil Appeal from Common Pleas |
| | : |  Court, Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___22nd___ day of _____April_____, 2016.

. . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Appellee State of Ohio

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 N. Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402
        Attorney for Appellant H.K.

LISA J. NILES, Atty. Reg. No. 0061134, 1122 W. High Street, Springfield, Ohio 45505
        Guardian Ad Litem

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} H.K. (Mother) appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which granted Clark County Children Services's (CCCS) motion for permanent custody of two of Mother's children,

L.J. and M.J.

### Custody Proceedings

**{¶ 2}** On April 14, 2014, CCCS filed a complaint alleging that L.J. and M.J. were dependent children, and the children were removed from Mother's home. A guardian ad litem was appointed for the children. On June 13, 2014, the trial court adjudicated the children to be dependent and granted temporary custody to CCCS. Temporary custody was extended at CCCS's request in April 2015.

**{¶ 3}** In August 2015, CCCS filed a motion for permanent custody of L.J. and M.J. A hearing was held in September 2015. L.J. and M.J. were ten and nine years old, respectively, at the time of the hearing. Their father did not participate in the proceedings, was not a legal resident of the United States, and was living out of the country. After the hearing, the trial court granted permanent custody of the children to CCCS.

### Assignments of Error

**{¶ 4}** Mother appeals from the judgment of the trial court, raising four assignments of error. The first three assignments relate to the manner in which the trial court considered the children's wishes about custody. Specifically, Mother claims that the trial court erred or abused its discretion in 1) failing to appoint an attorney for the children separate from the guardian ad litem, 2) failing to conduct an in camera interview with the children about their wishes, and 3) failing to give appropriate consideration to the children's wishes with respect to custody. In her fourth assignment, she asserts that the trial court erred in awarding permanent custody to CCCS.

*In Camera Hearing and Appointing an Attorney for the Children*

{¶ 5} The first and second assignments of error are interrelated, and we will address them together. The first assignment states that the trial court "committed reversible error" when it failed to appoint an attorney to represent the children; the second asserts that the trial court committed reversible error in failing to conduct an in camera interview with the children to determine their views about custody and whether their preferences about custody were in conflict with the views of the guardian ad litem about their best interest, and thus required the appointment of an attorney.

{¶ 6} "Generally, when an attorney is appointed as guardian ad litem, that attorney may also act as counsel for the child, absent a conflict of interest." *In re Janie M.,* 131 Ohio App.3d 637, 639, 723 N.E.2d 191 (6th Dist.1999), citing R.C. 2151.281(H) and *In re Smith*, 77 Ohio App.3d 1, 14, 601 N.E.2d 45 (6th Dist. 1991). The duty of a lawyer to his or her client and the duty of a guardian ad litem to his or her ward are not always identical and, in fact, may conflict. The role of guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest; the role of the attorney is to zealously represent his or her client within the bounds of the law. *In re Baby Girl Baxter,* 17 Ohio St.3d 229, 232, 479 N.E.2d 257 (1985). However, a court is not required to appoint separate counsel for the children in a permanent custody proceeding unless the guardian ad litem's recommendations regarding the children's best interest conflict with the children's own wishes. *See In re J.M.,* 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 52, citing *In re Williams,* 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110.

{¶ 7} Effective March 1, 2009, the Supreme Court of Ohio adopted Rule 48 of the Rules of Superintendence for the Courts of Ohio to govern guardian ad litem standards

in Ohio. Sup.R. 48(D)(8) provides: "When a guardian ad litem determines that a conflict exists between the child's best interest and the child's wishes, the guardian ad litem shall, at the earliest practical time, request in writing that the court promptly resolve the conflict by entering appropriate orders." Additionally, Ohio Rule of Juvenile Procedure 4(C)(2) provides: "If a person is serving as guardian ad litem and as attorney for a ward and either that person or the court finds a conflict between the responsibilities of the role of attorney and that of guardian ad litem, the court shall appoint another person as guardian ad litem for the ward."

{¶ 8} In determining whether a conflict exists, courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child. *In re B.K.,* 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 19. Generally, the appointment of independent counsel is necessary when the child has "consistently and repeatedly expressed a strong desire that is inconsistent with the guardian ad litem's recommendations." *In re M.H.,* 12th Dist. Fayette No. CA2012-11-035, 2013-Ohio-1063, ¶ 34; *In re B.W.,* 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 42.

{¶ 9} Some appellate courts have found that, where no request is made in the trial court for counsel to be appointed for the children in permanent custody proceedings, the issue will not be addressed for the first time on appeal. *See, e.g.*, *In re K.H.,* 9th Dist. Summit No. 22765, 2005-Ohio-6323, ¶ 41; *In re Graham,* 4th Dist. Athens No. 01CA57, 2002-Ohio-4411, ¶ 31-33.

{¶ 10} In this case, the guardian ad litem expressed her view that L.J. and M.J. were old enough to state their wishes about custody, and she testified about their wishes

as expressed to her. According to the guardian ad litem, L.J. had "gone back and forth" about his wishes, alternately expressing 1) anger at Mother, saying he did not want to live with her, 2) a desire to go home with Mother, promising to behave if he went home, and 3) a desire to remain in his foster home. "He's been all over the map." M.J. had expressed to the guardian ad litem her sadness that she had to live away from her mother and brother, but she also expressed that she felt very safe and happy in foster care and loved her foster parents. M.J. also stated that she would want to live with Mother "if [Mother] wouldn't cry anymore."[1]

{¶ 11} The trial court did not conduct an in camera interview with the children about their wishes. Based on the record of the case, the trial court had no reason to question the guardian ad litem's representations as to the children's feelings, and Mother did not request that the children be interviewed in camera at any time prior to or during the hearing. Mother also did not request in the trial court that an attorney be appointed for the children. Considering the relatively young ages of the children (10 and 9) and the lack of any other indications in the record that the children had a consistent and strong opinion about the custody determination that directly conflicted with the views of the guardian ad litem or that the guardian ad litem failed to report to the court, the trial court did not err or abuse its discretion by not conducting in camera interviews with the children sua sponte.

---

[1] The guardian ad litem's report further noted that L.J. "cannot be left alone with other children due to his violent nature" and that L.J. had a "history of sexually offending against his sister" and another child. Thus, even if the court had denied CCCS's motion for permanent custody, it would have been necessary to address concerns about whether the children could safely be placed together.

{¶ 12} Moreover, the record fails to reveal that an actual conflict existed between the children's wishes and the recommendations of the guardian ad litem. Based on the guardian ad litem's report and testimony, the transcript of the hearing, and the exibits presented in the trial court, there was no basis to conclude that L.J. or M.J. had "consistently and repeatedly expressed a strong desire" with respect to their placement that was inconsistent with the guardian ad litem's recommendations, i.e., a strong desire to be placed with Mother. A child's "waffling" back and forth about his or her wishes, or a child's expression that he or she would like to go home if "Mother would be different," but not under the same living conditions as existed previously, does not demonstrate a consistent, repeated, or strong desire to return the the parent's care. *See In re B.W.*, 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 34.

{¶ 13} Under the circumstances presented in this case, including the inconsistency in the children's stated desires and their relatively young ages, we disagree with Mother's assertion that the court was required to appoint counsel for the children; there was no evidence that the children had consistently and repeatedly expressed wishes as to the custody determination that conflicted with the guardian ad litem's view of their best interest. We also disagree with Mother's assertion that in camera interviews were essential to the court's determination, particularly in the absence of any request that the court conduct such interviews and of any evidence that the guardian ad litem's report did not accurately reflect the children's views.

{¶ 14} The first and second assignments of error are overruled.

*Consideration of Children's Wishes*

{¶ 15} In her third assignment of error, Mother argues that the trial court failed to

consider the wishes of the children. She also suggests that, in order for the consideration of the children's wishes to be meaningful, someone must have explained to the children what permanent custody means, i.e., that it resulted in the "extinguishment of any possibility for reunification; termination of visits and contact with parents and siblings; and potential for adoption."

{¶ 16} Mother's suggestion that the trial court did not consider the children's wishes is not supported by the record. Although the trial court did not discuss the issue at length in its judgment, it did note that the children (through the guardian ad litem) "indicate[d] a strong desire to be placed in a loving, secure, and permanent home." This characterization of the children's wishes does not reference the children's occasional and qualified statements of a desire to return to Mother's care, but it is consistent with the children's statements to the guardian ad litem that changes in their own behavior (L.J.) or Mother's behavior (M.J.) would be necessary to make living with Mother workable or desirable. This characterization is also consistent with the guardian ad litem's statements about the significant progress the children had made in the more stable environments of their foster homes.

{¶ 17} Mother cites no authority for her assertion that a child must be informed of all the ramifications of a permanent custody determination before the child's "wishes" can be meaningfully considered, and we are aware of none. R.C. 2151.414(D) states that the court shall consider "all relevant factors," including "the wishes of the child, * * * with due regard for the maturity of the child." This provision does not require that all of the specific consequences of a permanent custody determination be explained to the child as a prerequisite to consideration of his or her "wishes." Giving "due regard for the

maturity" of children 9 and 10 years old, particularly ones dealing with emotional and psychological issues, as in this case, the court could have reasonably concluded that an attempt to explain all of the weighty ramifications of a permanent custody decision would place an inappropriate emotional burden on the children and might even cause them to obscure their true wishes. What is required is that the court have an understanding and appreciation of the wishes of each child concerning his or her future life with the parent.

*Best Interest Analysis*

{¶ 18} Mother's fourth and final assignment of error challenges the trial court's determinations that awarding permanent custody of L.J. and M.J. to CCCS was in the children's best interests and that the children could not be returned to Mother's care within a reasonable period of time.

{¶ 19} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public children services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) is present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. R.C. 2151.414(B)(1); *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8.

{¶ 20} R.C. 2151.414(D) directs the trial court to consider all relevant factors

when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *See also In re S.J.* at ¶ 15. R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

{¶ 21} All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.,* 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. A trial court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re A.U.,* 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 22} The evidence presented at the hearing was as follows:

{¶ 23} The guardian ad litem for the children had been involved with the family since the children's removal in April 2014. With respect to Mother's mental health, which was frequently discussed at team meetings, the guardian ad litem stated that Mother would report that she (Mother) was in compliance with the case plan, attending her group and individual sessions, medical appointments, and the like, but Mother would not give the guardian ad litem access to any records from which these claims could be verified. The guardian ad litem testified that there were lots of discrepancies between the records she could access and Mother's self-reporting, and that she (the guardian ad litem) perceived a lack of credibility in Mother's reporting of events in her life, her treatment, her reasons for canceling visits, and in other contexts. The guardian ad litem had watched Mother's visitation with the children and reported that their interaction was appropriate, but she had never been allowed access to Mother's home.

{¶ 24} The guardian ad litem testified that Mother "has a very hard time staying stable in her life, taking care of her own mental health needs over a consistent period of time, and that she had small spurts of success * * * kind of grabs ahold of things for a short while and it looks like she's going to gain momentum, and then it just falls off, and then she might start again." The guardian ad litem's written report further detailed that Mother had a history of major depression, histrionic personality disorder, post-traumatic stress disorder, and panic disorder. Mother had unresolved issues with grief and loss and "crippling" panic and anxiety attacks, which sent her to the hospital three times during the course of these proceedings; she had previously attempted suicide two times. According to the guardian ad litem's report, Mother took "powerful medications" for her mental health diagnoses, had taken numerous pain medications, and was in "very poor

physical health." Additionally, Mother had endured "severe domestic violence" at the hands of her mother and two men, as well as sexual assault.

**{¶ 25}** The guardian ad litem had not seen any indication that Mother could do what was necessary to accomplish reunification with the children, care for her own medical needs, and stay out of jail (for shoplifting, as discussed below). Mother was noncompliant with many of the services offered to her, as well as with her medications, therapy, and techniques and skills that had been taught to her. Likewise, L.J. (the 10-year-old) was not compliant with his mental health treatment, and the children had very poor attendance at school, while in Mother's care.

**{¶ 26}** The guardian ad litem noted that Mother had been evaluated twice by a psychologist, Dr. Hrinko, who stated after the first evaluation that he believed Mother's difficulties could "respond to treatment" and that she could develop the skills to be an effective parent. After the second assessment, however, the guardian ad litem expressed concerns that Dr. Hrinko's recommendations were based, at least in part, on inaccurate reporting by Mother. For example, Mother had reported to Dr. Hrinko that she had been "actively involved in mental health treatment" since September 2014, an assertion that the guardian ad litem characterized as "simply not true."

**{¶ 27}** Mother told the guardian ad litem that L.J. "had significant and ongoing problems his whole life; that he had been medicated; diagnosed with * * * schizophrenia and bipolar; and that he had been violent in the past toward her, had been violent toward [M.J.], and had been really, really difficult." Mother claimed that these were among reasons she could not get L.J. to school, and she was afraid of L.J.

**{¶ 28}** The guardian ad litem observed that L.J. had a "severe behavioral history"

and that, in the guardian ad litem's opinion, Mother blamed L.J. for the chaos in the family because he was "not normal." The guardian ad litem also observed that L.J. has exhibited anger directed at women specifically. L.J. has had fewer behavioral problems in foster case because he goes to school regularly and attends his health and counseling appointments regularly.

{¶ 29} The behavior of M.J., the nine-year-old, also improved significantly in foster care. She went from "screaming for hours" to "significant and noticeable change" with the stability of foster care. M.J. was diagnosed with adjustment disorder attributable to the chaos, inconsistency, and traumatic atmosphere of Mother's home and to the abuse Mother suffered in some of her relationships with men, including the children's father. Mother acknowledged neither the abuse nor M.J.'s emotional problems.

{¶ 30} The guardian ad litem testified that she believed the children were adoptable and recommended that CCCS be awarded permanent custody of the children.

{¶ 31} The CCCS caseworkers, Hannah Wenner and Brooke Bodenmiller, testified that CCCS had been involved with Mother several times, specifically in 1993, 1996, and 2009. Throughout these involvements, there had been concerns regarding Mother's mental health, her stability, her compliance with services for the children, and the children's attendance at school; there had also been several referrals for physical abuse and neglect. Father had not been involved with the family or CCCS at least since the April 2014 removal of the children, and he was reported by Mother now to be living out of the country. In addition to L.J. and M.J., Mother has three older children with a different father or fathers; the oldest two were placed for adoption voluntarily, and the third was placed in the legal custody of the child's father.

{¶ 32} Wenner was first assigned to the case in 2014. She testified that Mother's mental health diagnoses included major depressive disorder, anxiety, mood disorder, and dependent personality disorder. L.J.'s mental health was also a concern at that time; he had been diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder, psychotic disorder, and bipolar disorder. Mother was not keeping up with counseling appointments or school attendance, and L.J. was not getting his medications.

{¶ 33} Mother's case plan focused on the following objectives: Mother was to address her own mental health, including therapy and medication, have a psychological assessment and follow any recommendations given, and complete a drug and alcohol assessment. Mother was also expected to visit with the children regularly and to attend their medical appointments. L.J. and M.J. were to attend counseling as well.

{¶ 34} In March 2014, Mother appeared at the juvenile court as a result of a truancy charge. The probation officer who she was there to see reported that Mother's speech was slurred and that she "seemed extremely intoxicated or heavily medicated." The probation officer was particularly concerned about this behavior because Mother had just dropped off L.J. and M.J. at another location. The probation officers did not allow Mother to walk or drive home because of their concern about her condition, and they called a relative to pick her up.

{¶ 35} According to Wenner, one of the recommendations from Mother's psychological evaluation was that she attend intensive counseling, which she did on far fewer occasions than what was recommended. With respect to visitation with L.J. and M.J., Wenner reported that Mother canceled many visits; between April and December 2014, Mother completed 20 of 35 scheduled visits. Mother "made a lot of excuses" to

the caseworker about why she was not in compliance with the case plan, and Wenner believed that part of the problem was that Mother had trouble balancing the things that were being asked of her. Wenner stated that Mother had made minimal progress on her case plan, but not as much as Mother claimed to have made. Although Mother stated on at least one occasion that she wanted help dealing with her children and the challenges they presented, Wenner testified that many community agencies were already familiar with Mother at that time and did not want to work with her due to her poor record of showing up for appointments.

{¶ 36} Wenner reported that Mother had more problems dealing with L.J. than with M.J. because of L.J.'s mental health issues, and Wenner reported "emotional maltreatment" of L.J., as documented by a "disturbing" tape recording. L.J. attended a program combining education and mental health treatment, rather than a traditional school. When the foster parents advocated for cutting back on L.J.'s medications because he was always tired and "zombie-like," Mother resisted the change and stated that she would put L.J. back on the medications if he returned to her care. L.J. was successfully weaned from all but one of his medications during the time that Wenner worked on the case.

{¶ 37} Wenner testified that, at the time she turned the case over to another caseworker, Mother wasn't participating in the case plan objectives, including mental health treatment, like she should, and that Mother was "less than truthful" about how she was doing. Wenner believed that Mother was "really overwhelmed" by what was being asked of her and was not able to meet even her own needs. Mother was not working and was receiving Social Security Disability, Section 8 housing, and food stamps; there

had been some concerns about fraud with respect to the housing and food stamp programs, and Wenner believed that Mother was having to pay back some benefits. Mother had been charged with theft four times in 2014, and on at least one occasion she had shoplifted while her kids were with her. Mother had been banned from four stores in Springfield due to such behaviors.

{¶ 38} Wenner reported that M.J. was flourishing in foster care and doing well in school and with her counseling. L.J. had had three foster homes since his removal from Mother's home; Wenner testified that "it can be difficult to find a foster home that is the right fit," especially if a child has a lot of behavior issues.

{¶ 39} Mother eventually completed the drug and alcohol assessment required by her case plan but, according to Wenner, it took Mother three months to complete because Mother kept canceling and "always [had] an excuse." Wenner testified that, in her opinion, granting permanent custody to CCCS was in L.J.'s and M.J.'s best interest. "I really just don't think she [Mother] has the ability to complete all the things in her case plan. I think her mental health really prevents her from accomplishing things and getting things done."

{¶ 40} The current caseworker, Brooke Bodenmiller, also testified; she had served as the CCCS caseworker since December 2014. Bodenmiller stated that Mother's case plan had been amended to add a parent-child interaction assessment and a review of Mother's psychological evaluation, and to allow visits with the children at Mother's home with a parent aide. Mother initially made progress on the plan, including attending more (but not all) of her own behavioral health group sessions. Based on Mother's progress, CCCS requested an extension of temporary custody in April 2015. But Mother's

progress began to fall apart in the summer, when Mother again asserted many conflicts with her behavioral health appointments, was in and out of jail, and gave various excuses for missing appointments. The behavioral health agency ended up reducing Mother's schedule from five days a week to three and then to two days per week because of poor attendance. In early 2015, Mother also did better attending her medication reviews and individual therapy sessions, but at the time of the hearing (September 2015), she had not attended individual therapy since May 2015, when her counselor had changed.

{¶ 41} Mother did complete a drug and alcohol assessment and kept 9 out of 16 appointments as part of her treatment at Mercy Reach; she "was completed from the program" in January 2015, but Bodenmiller expressed doubt about whether Mother had actually benefitted from the program.

{¶ 42} With respect to visitation, Mother had completed 35 of 58 visits at the Visitation Center in 2014, before the assignment of a parent aide to her case. Since January 2015, Mother had been more consistent, particularly after May 2015; Mother had missed only one visit in which the parent aide was expected to participate. Mother was not compliant, however, with counseling attendance; although Mother reported following through with behavioral health treatment and doing well, the records contradicted her claims. According to Bodenmiller, Mother did not even know who her current counselor was. Mother claimed to have a valid drivers' license, when in fact she did not. Bodenmiller testified that it was difficult to make face-to-face contact with Mother due to Mother's many cancellations of appointments, but that Mother could generally be reached by phone. Bodenmiller was unsure why Mother received Social Security payments and did not work, but she believed it was due to Mother's anxiety. Mother told her therapy

group that she had more frequent panic attacks after her visits with the children in her home began, but Mother had not reported this fact to the caseworker.

{¶ 43} According to Bodenmiller, L.J. was doing well with his current (third) foster placement and his behavior had improved. L.J. was attending a regular public school at the time of the hearing, but a change to a program more like one he had previously attended and which included a component of mental health treatment was being considered. Bodenmiller further testified that M.J.'s speech had improved and that both children were consistently attending school, which had been a significant area of concern when they lived with their Mother. Bodenmiller believed that both children were adoptable.

{¶ 44} In sum, Bodenmiller testified that she did not think that L.J. and M.J. could safely be reunited with Mother due to Mother's mental health history, L.J.'s need for mental health treatment, and Mother's lack of follow-through with treatment for herself and L.J. Bodenmiller believed that Mother's not having custody would allow the children's needs to be met more consistently and, by preventing Mother from feeling overwhelmed by her responsibilities, would also better allow Mother to manage her own treatment.

{¶ 45} The parent aide who worked with Mother during this case testified that she began working with Mother and the children in May 2015; Mother's initial visits with the children were "okay," but more recently the visits had been "pretty bad." L.J. acted disrespectfully, Mother became "agitated or irritable or overwhelmed," and M.J. did not get any attention because of Mother's focus on L.J.'s bad behavior. Mother made an effort to engage in structured activities with the children, but these activities often did not

engage the children. The aide also reported some inappropriate conversation in front of the children "with respect to the children's father" on topics such as domestic violence and rape, and Mother had indicated her approval of the children's watching R-rated movies. The aide believed that Mother "would have problems" parenting L.J. on her own because L.J. has "very severe mental health issues." According to the aide, Mother had acknowledged to her (the aide) that she (Mother) would have difficulty parenting L.J. M.J. was "very low maintenance," but gets her feelings hurt very easily. The aide testified that Mother could parent M.J. more effectively than L.J., but that L.J. bullied and hurt M.J.'s feelings, and Mother could not address this problem with L.J. effectively.

{¶ 46} An uncle who helped care for L.J., M.J., and one of the older children when they were removed from Mother's home on previous occasions, testified about prior traumas in Mother's life, including her own mother's suicide in the family home, after which Mother and her siblings had discovered the body. The uncle described this incident as having a "large impact" on Mother's life and her mental health issues. He stated that Mother continued to struggle with her own mental health needs.

{¶ 47} The uncle testified that he supported CCCS's current motion for permanent custody and that he had not agreed with CCCS's decision to return the children to Mother's care after a prior period of removal in 2010. The uncle continued to maintain monthly contact with L.J. and M.J. and testified that they were both doing very well in foster care. He stated that the children are "thriving and enjoying what they're becoming." The uncle further testified that L.J. "appreciates the structure that's expected of him" at his (the uncle's) house and in foster care, noting that Mother does not provide structure. L.J. had previously thrown tantrums when he did not get his way. The uncle

believed that M.J. was a "savvy" girl who understood what had been going on within the family for the past several years. Even though Mother would be better able to handle M.J. than L.J., the uncle did not believe it was in M.J.'s best interest to return to Mother's care, even as the only child in her care; M.J. enjoyed the success she was having in foster care and was doing well in school. The uncle stated that there was no chance of the children's being placed together with family members, other than with Mother.

{¶ 48} M.J.'s foster mother also testified that M.J.'s behavior had improved significantly since she first came to foster care, and that the foster family was willing to consider adoption.

{¶ 49} Mother also testified at the hearing. She stated that she received Social Security Disability based on her "mental health, plus [her] knee." Mother stated that she had five children by two different men, both of whom were abusive. Her own father was an alcoholic who had recently attempted suicide and, after her mother's death by suicide, Mother's father had not encouraged her (Mother) to get "mental health assistance." Mother reported that her mental health diagnoses have "always been bipolar and depression."

{¶ 50} Mother described L.J.'s mental health diagnoses as schizophrenia and bipolar disorder. She also testified that the school had recently reported he was experiencing anxiety, which she attributed to CCCS's seeking custody. She blamed others for her failure to comply with case plan requirements and/or minimized the problems which formed the basis of those requirements.

### The Trial Court Decision

{¶ 51} The trial court found that the children had "improved greatly" since being

removed from their mother's home, that they needed stability in their lives, and that they "simply can't wait for their mother to establish an appropriate relationship with them." The court found that L.J., in particular, was "in desperate need of stability, love, consistent enforcement of rules, and consistent administration of medicine." It also found that Mother "cycles on and off in her interest in caring for the children."

{¶ 52}  Further, the trial court concluded that Mother was not credible or honest in her testimony or her recounting of events involving the children; she consistently claimed that her inability to complete the case plan and to meet the needs of the children resulted from other people not doing what they were supposed to do or not giving her time to complete the objective.  The court found that Mother had consistently failed to visit with the children when she had the opportunity to do so, had failed to attend their medical appointments, and had consistently demonstrated her lack of commitment to the children.

{¶ 53}  The court ultimately found that it was in the best interest of the children to grant permanent custody to CCCS because, among other reasons, 1) there was a reasonable probability that they could be adopted and would greatly benefit from a permanent, secure home; 2) there was no probability that Mother would be able to provide a safe, secure and appropriate home for the children anytime soon; 3) Mother had not remedied the conditions that caused the children to be removed from the home; 4) there was no harmonious and loving relationship between the children and Mother or any extended family; and 5) there was no significant risk of harm to the children by not returning to Mother's care.

### Conclusion

{¶ 54}  The trial court's findings were supported by the evidence in the record,

and its conclusions that permanent custody was in the children's best interest and that the children could not be returned to their Mother's care within a reasonable period of time were supported by clear and convincing evidence. The trial court did not err or abuse its discretion in awarding permanent custody to CCCS.

{¶ 55} The assignments of error are overruled.

{¶ 56} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Ryan A. Saunders
James S. Armstrong
Lisa J. Niles
Hon. Joseph N. Monnin