[Cite as *In re J.H.*, 2016-Ohio-5266.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE:                              :
                                    :
        J.H.                        :    C.A. CASE NO. 27082
                                    :
                                    :    T.C. NO. 2012-9175
                                    :
                                    :    (Juvenile appeal from
                                    :     Common Pleas Court)
                                    :
                                    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___5th___ day of ___August___, 2016.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Montgomery County Children Services

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Boulevard, Springboro, Ohio 45066
        Attorney for Appellant, L.L.

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of J.H., now age 10, to Montgomery County Children Services (MCCS).   For the following reasons, the

judgment of the trial court will be affirmed.

## I. Procedural History

{¶ 2} MCCS filed a dependency complaint with respect to J.H. on December 31, 2012, who was then age 7, and it was awarded temporary custody. In April 2013, J.H. was adjudicated to be dependent. A case plan was developed, and MCCS worked with Mother on its objectives. Mother's substance abuse and mental health issues were the focus of many of the case plan's objectives. Although Father was also involved with MCCS to some extent, he made it clear to the caseworkers that he was not interested in obtaining custody of J.H.

{¶ 3} The trial court extended temporary custody in July and September 2014.[1] On November 20, 2014, MCCS filed a motion for permanent custody, and on March 19, 2015, Mother filed a motion for legal custody of J.H. A hearing was held on March 24, 2015. Father voluntarily surrendered his parental rights at the hearing. The magistrate filed a decision on May 6, 2015, awarding permanent custody to MCCS. Mother filed objections. On March 25, 2016, the trial court overruled the objections, adopted the decision of the magistrate, and awarded permanent custody to MCCS.

## II. Best Interests of the Child

{¶ 4} Mother raises one assignment of error, which challenges the trial court's conclusion that it was in J.H.'s best interest to award permanent custody to MCCS.

{¶ 5} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody of a child to a public children services

---

[1] R.C. 2151.415(D) permits a children services agency to seek two extensions of a temporary-custody order.

agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. R.C. 2151.414(B)(1); *In re N.C.*, 2d Dist. Montgomery No. 26611, 2015-Ohio-2969, ¶ 13.

{¶ 6} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. R.C. 2151.414(D); *In re N.C.* at ¶ 14. R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two

or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

{¶ 7} All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.,* 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. A trial court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re L.J.,* 2d Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.,* 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 8} Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.,* 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J .Y.,* 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 3.

{¶ 9} The parties do not dispute, and the trial court found, that J.H. had been in the temporary custody of MCCS for twelve or more months of a consecutive twenty-two-month period preceding MCCS's motion for permanent custody. Thus, we will focus on the best interest analysis, and we need not discuss the second part of the test set forth in R.C. 2151.414.

{¶ 10} Mother contends that MCCS did not establish, by clear and convincing evidence, that it was in J.H.'s best interest to award permanent custody to MCCS. The evidence presented at the hearing was as follows.

{¶ 11} Shelly Aggarwal was Mother's ongoing caseworker with MCCS at the time of the hearing. She had been working on J.H.'s case since February 2013. J.H. was nine years old at the time of the hearing. J.H. has one sibling, a half-sister who sometimes lived with him and who was removed from Mother's home at the same time. J.H.'s sister, who has a different father, was placed with her father's family and was not a party to these proceedings.

{¶ 12} Aggarwal testified that, throughout most of J.H.'s life, he had alternated living with Mother and his maternal grandmother, with Grandmother being the primary caregiver. However, both Mother and Grandmother have substance abuse problems. The record indicates that MCCS became involved in the case in 2012 after both women tested positive for drug use, and Grandmother stated that she and Mother were actively using illegal drugs together. There were also staff reports that a man in Mother's life had touched J.H.'s sister inappropriately while he was supervising her at Eastway (a mental health facility) during one of Mother's appointments. J.H. was placed in the temporary custody of MCCS after MCCS unsuccessfully explored the possibility of placement with other relatives.

{¶ 13} Mother's case plan objectives included the following: obtain and maintain permanent housing, employment, and income; obtain a Crisis Care assessment and follow any recommendations that resulted from the assessment; obtain and maintain sobriety; attend visitation with J.H.; provide financial support; and demonstrate behaviors

learned in therapy.

{¶ 14} According to Aggarwal, Mother lived in various homeless shelters or with a boyfriend for most of 2012, but eventually got an apartment through the Homefull program. She was unemployed for much of 2013 and sometimes received food stamps and Medicaid while unemployed, but Mother received no "cash assistance." She also received money for cigarettes from her mother. A "family support worker" was assigned to help Mother with applications, driving to submit applications, and work-related educational programs. Mother claimed to be turning in job applications and not hearing back from employers, but when the family support worker followed up with the employers, she learned that the applications had not been turned in.

{¶ 15} In November 2013, Mother obtained a job at Taco Bell. Although she was terminated in early 2014, Mother continued to claim that she was working as an excuse for being late to appointments and visitation. Aggarwal learned of the prior termination by calling Taco Bell. In June 2014, Mother obtained an "STNA" (the state-tested nursing assistant certificate) and got a job with Healing Touch, but the job only lasted a couple of months; Mother was terminated because of her criminal record. Just prior to the hearing, in March 2015, Mother claimed that she had been hired to work the third shift at a Waffle House, but she had not actually started working and had not provided Aggarwal with verification of her income or employment.

{¶ 16} Mother claimed that she had developed an addiction when a friend gave her what she thought were vitamins, but were really illegal drugs. The primary substances that she struggled with were heroin and pain medicine. Mother was already receiving mental health services through Eastway, so MCCS referred her to "CAM" for

substance abuse treatment, including group and individual therapy. In the spring and summer of 2013, Mother told several stories to Aggarwal about relapsing in her use of drugs and getting clean again; she only attended one appointment at CAM during this time, and she tested positive for opiates at that appointment. When questioned by Aggarwal about this positive test, Mother denied using illegal drugs and claimed she had been given pain medication at a hospital. Aggarwal asked Mother for discharge paperwork to verify this claim, but Mother did not provide such paperwork. Mother also never went back to CAM.

{¶ 17} Mother was subsequently referred to Eastway for a substance abuse program, but her attendance at the program sessions was "very sporadic"; Mother claimed that she had forgotten appointments, had transportation problems, or had conflicting appointments. Although Mother admitted to Aggarwal that she had one relapse, she reported to others involved in her treatment that she had relapsed several times and was using "half to one gram of heroin daily." Mother was also referred to Project Cure for a methadone treatment program, but she revoked the medical release that allowed Aggarwal to obtain information about Mother's progress.

{¶ 18} Mother tested positive for opiates monthly from March through October or November 2014, but she continued to deny any illegal drug use and to attribute her positive drug test results to pain medications. She did not provide any proof that such medications had been prescribed for her. Moreover, in the midst of this denial of drug use, Mother asked her therapist at Project Cure for a referral to Nova House "for coping skills for substance abuse." The referral was initially denied because of Mother's ongoing positive drug tests, but she eventually entered a 30-day program at Nova House in

December 2014.   Mother later claimed that her therapist at Project Cure had told her "not to worry about the groups or the therapy right now" because the organization was "restructuring."

{¶ 19}   Aggarwal testified to her belief that Mother was still associating with people who were using illegal drugs, citing an incident in which a male friend had overdosed at Mother's apartment in February 2015.   (Drug use at the apartment also put Mother's housing in jeopardy.)   Mother brought the same man to a visit with J.H., without MCCS's approval.   Mother introduced the man to J.H. outside the building so they would not be observed.   This introduction created a rift with J.H. and an emotional setback for him; Mother had told J.H. there would be no other guys in their lives, and J.H. was afraid Mother would pick the man over J.H.   Based on what Mother said to J.H. about the man, he appeared to be living with Mother.   Aggarwal further testified that, around the same time, a man had answered Mother's phone when Aggarwal attempted to contact Mother and seemed very familiar with her routine and whereabouts.   Aggarwal testified that Mother's willingness to put J.H. in potentially unsafe situations with her boyfriends was "repeating the same behavior that kind of got the case opened to begin with" and was "a huge concern" of MCCS.

{¶ 20}   With respect to Mother's mental health, Aggarwal stated that Mother had been diagnosed with "bipolar NOS," post-traumatic stress disorder, depression, anxiety, opioid dependence, and bulimia nervosa.   Aggarwal testified that Mother was "very sporadic taking her medication" for mental health issues throughout the case.   Mother was eligible for help in paying for her medications from the Patient Assistance program, but she did not follow through with applying.   She went without her medication for several

months between 2013 and 2014, and had an "ongoing issue of not taking her medications regularly," although the medications were eventually covered through Medicaid.

{¶ 21} J.H.'s visitation with Mother after his removal was "very, very chaotic," and after the visits, he acted out by drawing violent pictures and saying violent things; he would also have trouble sleeping, wet the bed, did not want to sleep alone, and did not let anyone touch him. For these reasons, visits were suspended from March through December 2013. According to Aggarwal, J.H. expressed mixed feelings or was "wishy-washy" about visits; he enjoyed the visits when Mother would bring him candy, soda, or toys, but if she did not bring anything, he did not want to see her. When visits resumed in December 2013, they went well at first and Mother attended consistently but, within a short time, she began not showing up for visits, which left the children (J.H. and his sister) "heartbroken." Mother's visits became more consistent again after May 2014, but J.H.'s interest in the visits remained tied to Mother's promises to buy him things and do things with him, and she did not consistently follow through on those promises. J.H. had also observed that, if he lived with Mother, "he wouldn't have to follow the rules," because she lets him do whatever he wants.

{¶ 22} J.H.'s transition to a new foster home occurred in November and December 2014, approximately 3 months before the hearing. Although the adjustment to the new foster home had been difficult for J.H., Aggarwal expressed confidence that his relationship with the foster family and his comfort level in the home would improve with time.

{¶ 23} With respect to Father, Aggarwal testified that Father claimed not to be able to care for J.H.; Father had not visited with J.H. in two years and did not see any

point in doing so if he did not want custody. Father also stated that he did not want anything to do with Mother, because of the "potential she had to hurt him and to ruin his life." Grandmother was also involved in the case plan and had expressed an interest in custody of J.H., but Aggarwal testified that Grandmother had never followed through with a home study, which was a prerequisite to obtaining custody, and had substance abuse issues of her own.

{¶ 24} In conclusion, Aggarwal testified that reunification of J.H. with either parent was not possible in "the foreseeable future." With respect to Mother in particular, Aggarwal observed that Mother continues to make poor choices and to place J.H. in unsafe situations, and that it is not apparent that Mother's substance abuse has been resolved.

{¶ 25} Melodie Morrow, J.H.'s therapist of almost two years at the time of the hearing, met with him two to four times per month during that period. She testified that she had worked with J.H. on issues related to adjustment to foster care and Type II Post-Traumatic Stress Disorder, which she described as a "more chronic" type of PTSD than Type I, with which more people are familiar. Type II PTSD is rooted in "developmental trauma" through neglect over an extended period of time that "throws [a kid] off a normal course of development."

{¶ 26} As a consequence of J.H.'s PTSD, he engaged in "sexualized and aggressive social play," was not well socialized, had trouble sleeping and had nightmares, was fearful, had "low startle threshold," and thought of himself as a "bad boy." Morrow viewed these problems as a result of early exposure to a drug-addicted caregiver and exposure to violence and other inappropriate conduct at a formative age, which forced

J.H. to focus on survival rather than normal learning.

{¶ 27} Morrow's therapy with J.H. focused on relationship building, developing a sense of safety in his foster home, skill development (like appropriate play), "self-regulation," and helping J.H. to recognize and cope with the role of trauma in his life without letting it define him. In Morrow's view, the foster parents and anyone else caring for J.H. needed to play an important role in his therapy. Mother did not participate in therapy with J.H.; she had expressed an interest in doing so one time, but never followed through.

{¶ 28} J.H.'s first foster family placement began with some difficulty and frustration, but as the foster parents learned skills to deal with J.H.'s behavior, the situation improved significantly. J.H. began to do better at school, to follow house rules, and to feel safe, and love developed between J.H. and the foster parents. However, in late 2013, some troubling behaviors resurfaced as J.H. rebelled against seeing his mother (whom he had not seen for many months); "some sexual stuff" began to emerge again, including inappropriate play with the foster parents' son and references to sexual movies he had seen.

{¶ 29} According to Morrow, J.H. expressed some interest in seeing his mother, but also expressed fear at the prospect that she would bring men with her, expose him to "mean people," and make him watch scary movies; he also suggested that he wanted to see his mother to "get stuff" from her. When J.H. did visit with his mother, she gave him a cell phone without asking permission of the caseworker or foster parents. Morrow suggested that this increased communication with Mother contributed to J.H. "grow[ing] more and more disconnected from his foster parents and * * * extremely defiant,"

although these conditions improved some when the phone was taken away. Around this time, J.H.'s behavior at school also began to deteriorate, and he experienced higher anxiety.

{¶ 30} In late spring or early summer 2014, J.H. learned from his foster family that he was going to be placed in a different foster home. According to Morrow, this change led to sadness, fear, and anxiety, because J.H. did not deal well with chaos in his life. However, J.H. did not express a desire to live with his mother except to "get things." J.H.'s adjustment to a new foster family was difficult, and Morrow testified that he became "pretty closed down." J.H. had reverted to seeing his persona as a "bad boy" in the new foster home, but Morrow was confident that the new placement would improve with time, just as the first placement had.

{¶ 31} Morrow testified that J.H. needs stability, order, safety, routine, sleep (because he lives under a high degree of stress, which is very tiring), play time (to discharge anxiety), predicable and appropriate interactions with caregivers, loving discipline, and emotionally mature adults in his life who model responsible behavior. "[T]his is a child who tends to want to go – wants to color outside the lines. So if you have an adult who also colors outside the lines, he – that's where he's going to move. That's his tendency." Morrow also stated that J.H. needs to be with adults who set firm limits, because J.H. will push against them. J.H. will need a lot of patience from adults for a long time, and needs a trustworthy person to manage his ADHD medication, which is a controlled substance. Finally, Morrow testified that J.H. "has poor boundaries when it comes to other people," and she worried that, "if we don't get that shored up, he's going to become a risk to – a risk to other people."

{¶ 32} Allene Anderson worked with Mother on parenting education through Celebrating Families of Children and Adults with Special Needs, following a referral from MCCS. Anderson testified that Mother's children satisfied the agency's criteria for services, and that she worked with Mother from June 2013 through July 2014. Anderson counseled Mother about rules and responsibilities, being a caregiver and an advocate for a child, and appropriate methods of discipline. However, Anderson testified that Mother's attendance was "real sporadic"; Mother was supposed to attend weekly sessions, but she missed many of them. In approximately one year, Mother attended about 30 of 54 sessions. Moreover, when Mother did attend, she often claimed to be sick, was sweating, and would leave early.

{¶ 33} According to Anderson, Mother frequently talked about J.H.'s "difficult behavior" but would not be very specific, and Mother "always wanted to call somebody to help her." Mother also attributed her involvement with MCCS to the behavior of others, like her ex-husband's domestic violence. Her plan for caring for J.H. if he were returned to her custody relied heavily on the help of family members, although her relationship with her family was rocky.

{¶ 34} Alexa Jackson, a case manager at Eastway Corporation, an outpatient mental health center, was involved with Mother's case for two years. The primary goals for Mother's treatment were to make sure she met regularly with her psychiatrist, to take her medication as directed, to develop skills to reduce her anxiety and improve her sleep, and to obtain stable housing. Jackson testified that Mother was "mostly," but not entirely, compliant with her individual therapy goals and with their monthly meetings. At the time of the hearing, Mother had recently claimed during one of their meetings that her

medications had been stolen by "some guy she let stay with her." Mother also reported that she was "substance free" while seeking a referral to Nova House for additional substance abuse treatment.

{¶ 35} In finding that it was in J.H.'s best interest to place him in MCCS's permanent custody, the trial court's judgment noted J.H.'s many psychological and emotional issues, Mother's failure to participate in therapy with him, the chaotic nature of their visits, and the regression of J.H.'s behaviors following contact with Mother. The court found that the nature of J.H.'s relationship with his Mother weighed in favor of granting permanent custody to MCCS. The court also noted J.H.'s distress at the prospect of being placed with Mother, his relative success in foster care, and his "desperate need [for] a legally secure, permanent placement." The court found that Mother had not completed her case plan, was not "suitable" for custody of J.H., and that J.H. could not be placed with Mother within a reasonable period of time.

{¶ 36} The record contains competent, credible evidence from which the court could have concluded that the statutory elements for a termination of parental rights had been established and that it was in J.H.'s best interest to grant permanent custody to MCCS. The assignment of error is overruled.

### III. Conclusion

{¶ 37} The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

DONOVAN, P.J. and FAIN, J., concur.

Copies mailed to:

Kirsten A. Brandt
Marshall G. Lachman
Cynthia Westwood
Al Minor
Steven Abshire
Daniel Brinkman
Hon. Anthony Capizzi