[Cite as *In re G.Y.*, 2018-Ohio-672.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN THE MATTER OF: | : | Appellate Case No. 2017-CA-20 |
| | : | |
| G.Y. | : | Trial Court Case No. 21430473 |
| | : | |
| | : | (Juvenile Appeal from |
| | : | Common Pleas Court) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of February, 2018.

. . . . . . . . . . .

AUTUMN H. WHITE, Atty. Reg. No. 0088672, 201 West Main Street, 2nd Floor, Troy, Ohio 45373
    Attorney for Appellee

FRANK M. BATZ, Atty. Reg. No. 0093817, 126 North Philadelphia Street, Dayton, Ohio 45403
    Attorney for Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Miami County Court of Common Pleas, Juvenile Division, which granted permanent custody of her son, G.Y., to Miami County Children's Services Board (MCCSB). For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} MCCSB began working with Mother in February 2013 following reports of neglect concerning three of her children. Those children were adjudicated dependent and were removed from her care. Two were placed with relatives, and one was placed with a close family friend; a fourth child resides with his father.

{¶ 3} G.Y. was born in late December, 2014. Hospital personnel contacted MCCSB after Mother expressed a desire to harm herself and G.Y. Two days after his birth, in an ex parte order, MCCSB was granted interim custody of G.Y., and he was placed with a foster family. G.Y. has remained with that foster family throughout these proceedings.

{¶ 4} On January 2, 2015, MCCSB filed a complaint for dependency and a request for interim custody. Interim custody remained with MCCSB, pending a dispositional hearing. On March 25, 2015, the trial court filed an agreed entry in which the parties agreed that G.Y. was a dependent child and that it was in his best interest to be placed in the temporary custody of MCCSB. The trial court approved a case plan for Mother. The case plan objectives included anger and stress management, parenting skills, maintaining safe and stable housing with working utilities, and maintaining employment. Mother was also required to take psychiatric medication as prescribed and to participate

in individual counseling and parenting classes.

{¶ 5} On December 15, 2015, MCCSB moved to change G.Y.'s disposition from temporary custody to permanent custody. The court held a disposition hearing on March 16, 2016, at which time MCCSB asked to modify its motion to a request for a first extension of temporary custody. The court granted the motion.

{¶ 6} On June 9, 2016, MCCSB again filed a motion to change G.Y.'s disposition from temporary custody to permanent custody. The motion stated that G.Y. could not or should not be placed with either parent within a reasonable time, and that G.Y. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. The trial court scheduled a hearing for August 11, 2016.

{¶ 7} A hearing was held before a magistrate, as scheduled. On August 25, 2016, the magistrate issued a lengthy decision, granting permanent custody to MCCSB. The magistrate found that G.Y. had been in the temporary custody of MCCSB for 12 or more of a consecutive 22-month period and that permanent custody to MCCSB was in his best interest. Mother objected to the magistrate's decision, arguing that the evidence did not demonstrate that it would be in G.Y.'s best interest that permanent custody be granted to MCCSB.

{¶ 8} On February 17, 2017, the trial court overruled Mother's objection and "affirmed in its entirety" the magistrate's decision. Mother appealed from that ruling, but we dismissed the appeal for lack of a final appealable order. *In re G.Y.*, 2d Dist. Miami No. 17-CA-04 (June 20, 2017). The trial court issued an amended judgment entry on August 14, 2017, which overruled Mother's objection, found that permanent custody to MCCSB was in the best interest of G.Y., and terminated Mother's parental rights.

{¶ 9} Mother appeals, raising two assignments of error.

## II. Requirements for an Award of Permanent Custody

{¶ 10} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody of a child to a public children services agency.   The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period.   R.C. 2151.414(B)(1); *In re N.C.*, 2d Dist. Montgomery No. 26611, 2015-Ohio-2969, ¶ 13.

{¶ 11} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the

factors in R.C. 2151.414(E)(7) through (11) are applicable. *See also In re N.C.* at ¶ 14. R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

{¶ 12} All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. A trial court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re L.J.*, 2d Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 13} Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.*, 2d Dist. Miami No. 2007-CA-35, 2008-Ohio-3485, ¶ 3.

{¶ 14} The magistrate found, and Mother did not dispute, that G.Y. had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period preceding MCCSB's motion for permanent custody, in accordance with R.C. 2151.414(B)(1)(d). Mother's objections in the trial court and her arguments on appeal focus solely on the best interest analysis. Accordingly, we will confine our analysis to whether the trial court erred in finding that permanent custody to MCCSB was in the best interest of G.Y.

### III. Best Interest of G.Y.

{¶ 15} Mother's assignments of error state:

1. The trial court's determination to grant custody to Miami County Children Services was based on insufficient evidence as a matter of law.

2. The trial court's determination that granting permanent custody to Miami County Children Services is in the best interest of the child, is not supported by clear and convincing evidence, and is against the manifest weight of the evidence.

{¶ 16} The evidence presented at the August 11, 2016 hearing was as follows.

{¶ 17} Mother testified that she has five children, none of whom is living with her. She stated that her second child is living with his father "due to the fact that your guys' agency called his father and lied to him." She indicated that she lost custody of two children in 2013 "when I had a mental breakdown due to the fact that I'd lost a job, was about to lose my home and got raped all in one week." With her oldest, Mother testified that his grandmother "basically overruled [Mother]" and only let Mother see him when it was convenient for the grandmother. Mother acknowledged that MCCSB had filed

complaints regarding three of her children. When asked why MCCSB initially sought custody of G.Y., Mother stated, "Because somebody lied saying that I was gonna kill my son supposedly after I gave birth to him which wasn't even true."

**{¶ 18}** Mother stated that she had completed parenting classes when she was pregnant with G.Y., but was asked to complete them again as part of G.Y.'s case plan. Mother began parenting classes at Shelby County Counseling Center in May 2016, and the sessions were ongoing at the time of the hearing. Mother indicated that she brings food, primarily fruit, to visitation with G.Y., and there had been concerns in the past about her bringing inappropriate foods. Mother does not bring games, because she was "scared to bring games 'cause of him being so little." Mother testified that she would take G.Y. to the park and on walks if she had G.Y. back.

**{¶ 19}** Mother testified that she received a psychological evaluation in September 2015. Mother began counseling at Shelby County Counseling, but she did not know how many times she went and how many times she did not show up. Mother stated that she initially attended twice per month, and then it slowed to once per month. Mother finds the counseling helpful; she testified that she has learned techniques to deal with anger and anxiety and has worked with her counselor on parenting skills. Mother is prescribed two psychiatric medications by a psychiatrist at Shelby County Counseling; she fills them "when I can." From early 2016 until June or July 2016, Mother did not fill her medications due to lack of insurance. Mother testified on direct examination that she had been taking medications since March 2016 and that she last filled her prescriptions in July 2016.

**{¶ 20}** Mother testified that she has been working at Burger King since May 2014. At the time of the hearing, she was working 30-40 hours per week at $8.10 per hour.

Prior to June 2016, Mother also worked at two different factories and a restaurant. Mother stated that she pays child support out of her Burger King paycheck, and currently brings home "a little over a hundred dollars every two weeks." Mother has been applying for another job, and she stated that, if she got her children back, she would stop working at Burger King and just work the higher-paying job. Mother would ask her sister-in-law or a close friend to baby-sit, if needed.

{¶ 21} From July 2015 until February 2016, Mother resided with friends. For the six months preceding the hearing, Mother resided in a one-bedroom apartment in Sidney; the rent was $250. Mother has beds for herself, G.Y., and another child in her bedroom. Mother has an air conditioning unit in one bedroom window; two other bedroom windows are covered with plastic to avoid contact with any lead paint. Mother has two dressers and a bookcase in the living room. Mother testified that she has a large yard behind her residence. Mother testified that she has three cats, but would get rid of them if she got custody of G.Y. She stated that her boyfriend brings his two dogs when he sleeps over, but he would not be allowed to be there if she had G.Y. She testified that she planned to stay at her current apartment until she could afford a larger apartment; she indicated that she was having difficulty due to her credit history.

{¶ 22} Mother testified that she is ready, willing, and able to parent a young child. She stated that she would keep her home clean and that she would continue with her medications, counseling, and employment.

{¶ 23} Cynthia Mlinar, a therapist at the Shelby County Counseling Center, has been providing counseling for Mother since September 2015. Mlinar testified that when Mother began coming, she was "pretty angry," "didn't use appropriate language," and was

"pretty unstable." They have worked on Mother's anger, depression, childhood trauma, as well as parenting skills. Mlinar originally saw Mother approximately every two weeks, but for the past few months, she had come once a month, due to staff shortages and scheduling difficulties. Mlinar indicated that Mother has made "significant progress"; Mother has attended counseling when required, has held two jobs, has "done a good job controlling her anger," and has been honest during counseling. Mlinar saw Mother with an older child once, but she has never seen Mother with G.Y.

{¶ 24} On cross-examination, Mlinar acknowledged that there was a period of time when Mother was unable to attend counseling and that Mother had recently lost her second job. Since losing her second job, Mother has expressed concern about lack of income. Mlinar testified that there was a time when Mother "slipped through the cracks for Medicaid" and stopped taking medication for a period of time. Mlinar noticed "great improvement" when Mother took her medication. Mlinar believed that Mother was currently taking her medication, but a document from the prescribing psychiatrist indicated that Mother had missed her most recent appointment.

{¶ 25} Erin Ogdon, an on-going caseworker with MCCSB, became involved with Mother in 2013 due to reports of neglect and abuse regarding three of Mother's children. In July 2013, Mother reported having suicidal thoughts, and her children were placed on safety plans. The children were placed with other relatives, and a case plan was developed for Mother.

{¶ 26} Ogdon testified that, between January 2014 and January 2015, Mother was not compliant with her case plan; she often refused to do therapy, and she had a history of not taking mental health medication. Ogdon stated that Mother struggled with

depression, anger issues, suicidal and homicidal ideations, and was overwhelmed. Mother completed parenting classes, but the instructor stated that Mother had a "long way to go" and recommended intense anger therapy.

{¶ 27} Ogdon continued to be Mother's caseworker during Mother's pregnancy with G.Y. At the time of G.Y.'s birth, Mother expressed that she wanted to cut the baby out and harm the baby. The hospital contacted MCCSB due to Mother's statements, and the agency filed a complaint regarding G.Y. due to safety concerns.

{¶ 28} Ogdon remained Mother's caseworker for a month after G.Y.'s birth. She testified that the agency looked into possible relative placements for G.Y., and Mother requested that her close friend, who had legal custody of one of Mother's other children, have custody of G.Y. G.Y.'s father was unknown, and the agency had concerns about G.Y.'s being placed with the friend. When Ogdon stopped being Mother's caseworker, Odgon did not believe that Mother had made substantial enough progress on her case plan.

{¶ 29} Trudy Fugate became Mother's caseworker on approximately January 30, 2015. Fugate testified that Mother's case plan involved parenting classes, mental health counseling, psychiatric services, employment, and housing. Fugate made referrals for Mother for psychiatric evaluations and parenting classes, and she provided Mother a list of subsidized housing and metropolitan housing information.

{¶ 30} Fugate testified that, when she became Mother's caseworker, Mother was supposed to be going to counseling in Troy due to a prior psychological assessment; between January and March 2015, Mother attended three appointments, cancelled five, and was a no-show for two. Mother did not attend individual counseling between March

and September 2015. Since September 2015, Mother had 22 individual counseling sessions scheduled; she attended 13 sessions. Fugate stated that Mother has not successfully completed the individual counseling requirement of her case plan.

{¶ 31} Fugate testified that Mother is prescribed psychiatric medication through a psychiatrist at Shelby County Counseling. Mother has attended four out of seven scheduled appointments with that physician. Mother initially filled her prescriptions, but she failed to fill her prescriptions for several months during the first half of 2016. Fugate stated that Mother has not been compliant with the case plan objective of taking her medication as prescribed, and that this failure would pose a risk to G.Y.

{¶ 32} Fugate referred Mother for a new psychological evaluation, but Mother did not complete a psychological evaluation until February 2016, after three referrals by Fugate (June 2015, November 2015, and January 2016) and one no-show for an evaluation (November 2015). The February 2016 psychological evaluation indicated that Mother "appears to have longstanding problems with anxiety and depression dating back to her childhood," which appeared to have been "highly dysfunctional with experiences of abandonment by her father, physical and emotional abuse, victim of rape, and academic difficulties." Testing indicated that Mother was "functioning in the borderline range of intellectual abilities." In terms of her cognitive functioning, the report noted that Mother scored low on her verbal intellectual abilities, "which may hamper her ability to benefit from psychotherapy." Mother may have difficulty understanding complex or abstract concepts, making generalizations from one situation to another, and forming trusting relationships. The report recommended that Mother continue outpatient mental health services, continue monitoring for PTSD and ADHD, and maintain stable

living conditions, such as housing and employment.

**{¶ 33}** Fugate testified that Mother refused to complete parenting classes until March 2016; after some back and forth, Fugate agreed to allow Mother to work on parenting skills with her (Mother's) therapist.

**{¶ 34}** Mother has supervised visitation with G.Y. at MCCSB once a week for two hours.   It had been twice a week for one hour until Mother relocated to Sidney, Ohio. Mother has attended 90 out of 125 offered visitations.   Mother "sometimes" calls if she is going to miss the appointment.   In late June 2015, after Mother no-showed for several visits in a row, Fugate required Mother to arrive an hour early, at which time the foster parents were called and instructed to bring G.Y. over.   This visitation protocol was lifted in April 2016.

**{¶ 35}** Fugate testified about the progression of Mother's visits with G.Y.   When G.Y. was an infant, the visits consisted of Mother's holding, feeding, and rocking him. Fugate stated that Mother was very good at changing G.Y.'s diaper.   As G.Y. has gotten older, Mother would sit on the floor and get out toys for him; now, they just play.   At one point there were concerns about the foods that Mother brought for G.Y., but she now brings fruit, which G.Y. likes.   Fugate testified that she thought there was a bond between Mother and G.Y., although she was not "sure it's a parent bond or someone to play with." Since about April 2016, G.Y. has started to cry when Mother takes him from his foster mother.

**{¶ 36}** Fugate expressed some concern that, at visitation, Mother has a tendency to "play fight" and wrestle with G.Y., and then would place him in time-out when he hit. Fugate spoke with Mother about G.Y.'s not understanding the difference between play

fighting and hitting and about the length of his time-out. Fugate agreed that Mother might have been further along in her parenting skills if she had started parenting classes earlier.

{¶ 37} G.Y. has not had any visits with his biological siblings.

{¶ 38} With regard to Mother's employment, Fugate testified that Mother is working at Burger King. Mother told Fugate in a telephone conversation shortly before the hearing that she (Mother) was working a second job at a factory, but Mother had lost her employment with the factory in June 2016. Fugate did not believe that Mother's income from Burger King alone was sufficient to support her or G.Y.'s needs.

{¶ 39} Fugate testified that Mother resided with friends during 2015. Fugate visited Mother at her home beginning in February 2016. Fugate stated that Mother's apartment is small and cluttered. Mother initially had her possessions stacked in the living room, leaving little room. She later moved them to the porch, and then to the basement. Initially, the windows were nailed shut, but the nails had been removed. Fugate was concerned about possible lead paint in the windowsills. When Fugate visited shortly before the hearing, Mother had three cats (former strays) and two dogs at her residence, and her belongings were stacked in the bedroom. Mother told Fugate that the dogs belonged to Mother's brother, but Fugate has learned that they belong to Mother's boyfriend. When Fugate met a man at Mother's apartment, Mother provided the wrong name for him, and Mother told Fugate that he was a friend who helped her watch the dogs. Fugate did not consider Mother's housing to be appropriate for G.Y.

{¶ 40} Fugate testified that she did not believe that Mother had made substantial enough progress on her case plan to have G.Y. returned to her care. Fugate also did not believe that another extension of time would be sufficient to enable G.Y. to be returned

to Mother.

{¶ 41} Fugate testified that G.Y. has been with the same foster family since birth, and he is bonded with them. The foster family is licensed as "foster and adoption."

{¶ 42} Jacquelyn Chamberlain, the court-appointed special advocate (CASA), testified that she was originally appointed in August or September of 2013 concerning Mother's other children and became involved with G.Y. in January 2015. Chamberlain visits with G.Y. once or twice per month, sometimes at visitation and sometimes at his foster home.

{¶ 43} Chamberlain described G.Y.'s interaction with his foster family as "very happy" and she indicated that G.Y. was strongly bonded with his foster mother. G.Y. has displayed separation issues when leaving his foster mother to visit with Mother. During G.Y.'s recent visits with Mother, Mother has let G.Y. watch a DVD, and Mother has interacted with the adults who were present as well as with G.Y. Chamberlain stated that Mother was meeting G.Y.'s needs during the visits, but Chamberlain did not believe that G.Y. was bonded to Mother.

{¶ 44} Chamberlain had last visited Mother's residence the day before the hearing. Chamberlain described the one bedroom apartment as dirty and cluttered with five animals – three cats and two dogs; cat litter and feces were on the floor. Chamberlain also indicated that there were times when she believed Mother was not taking her medication, most recently in June 2016 (two months before the hearing).

{¶ 45} Chamberlain stated her opinion that permanent custody to MCCSB was in G.Y.'s best interest. She testified that G.Y. would experience a loss if separated from his foster family, that she (Chamberlain) had concerns about Mother's ability to meet

G.Y.'s needs independently, that Mother's home was not appropriate for G.Y., and that she had concerns that Mother would not be able to sustain the skills necessary to parent G.Y.

{¶ 46} In overruling Mother's objections to the magistrate's grant of permanent custody to MCCSB, the trial court found that custody to MCCSB was in G.Y.'s best interest. The court reasoned:

> Regarding interaction, it is apparent that [G.Y.] is in the same foster home since birth (Tr. 61, 92) and is doing very well (Tr. 94). [G.Y.] is a typical toddler, has foster siblings in the home, is bonded with the family, and is happy (Tr. 149). [G.Y.] has not bonded with [Mother].

> In addition, the court has considered substantial facts regarding best interest: [Mother] brings inappropriate food to feed [G.Y.] (Tr. 30, 71, 72), [Mother] doesn't remember dates and appointments at providers such as Recovery and Wellness and Shelby County Counseling (Tr. 32) probably because her history is sketchy at best (outline of attendance set forth at Tr. 74-79), she acknowledges anger issues (Tr. 33), she is living in an apartment that CASA has described as inappropriate (Tr. 153, 163), [Mother] has had three other children removed by MCCSB (Tr. 51), she often refused therapy (Tr. 52), she [is] intermittent in medication requirements (Tr. 52), she completed parenting class, but needed more anger therapy (Tr. 52).

> According to her caseworker Fugate, [Mother] took 14 months to start her case plan services (Tr. 63), argued that she didn't need to do

parenting classes again (Tr. 64), and missed numerous scheduled visitations (Tr. 66). Fugate testified that [Mother] missed several therapy appointments (Tr. 80) and was not compliant with her recommended medications (Tr. 82).

Fugate agreed with the CASA that housing was not appropriate (Tr. 90) and concluded that [Mother] has not made substantial enough progress to have [G.Y.] returned to her and that an extension will not be beneficial (Tr. 92). Fugate acknowledged some progress, but no more than before (and as required) and that the significant progress required by the second motion has not occurred (Tr. 129).

CASA Chamberlain acknowledged that there was an attempt by [Mother] to comply with the plan, but the progress is short-lived, and she will be unable to sustain those skills on a permanent basis (Tr. 153-154).

{¶ 47} Upon review of the record, the trial court's determination that permanent custody to MCCSB was in the best interest of G.Y. was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find no error in the trial court's determination to grant custody to MCCSB.

{¶ 48} Mother's assignments of error are overruled.

### IV. Conclusion

{¶ 49} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Autumn H. White
Frank M. Batz
Hon. W. McGregor Dixon, Jr.