[Cite as *In re A.C.*, 2019-Ohio-2036.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE: A.C., D.C., & D.C. | : | Appellate Case No. 28275 |
| | : | |
| | : | Trial Court Case Nos. 2016-0753, |
| | : | 2016-0755 & 2016-0757 |
| | : | |
| | : | (Appeal from Common Pleas Court – |
| | : | Juvenile Division) |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 24th day of May, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
  Attorney for Plaintiff-Appellee, MCCS

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
  Attorney for Defendant-Appellant, Father

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Father appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of his three children – A.C., Do.C., and Da.C. -- to the Montgomery County Department of Job and Family Services, Children Services Division (MCCS).   For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} In the autumn of 2015, MCCS received referrals regarding A.C. (born May 2007), Do.C. (born March 2012), and Da.C. (born July 2013) based on Mother's substance abuse and failure to provide for the children's needs.   During that time, Father was incarcerated at the Montgomery County Jail, and he was subsequently convicted of possession of heroin.

{¶ 3} On February 3, 2016, MCCS filed a neglect and dependency complaint regarding A.C., and abuse, neglect, and dependency complaints regarding Do.C. and Da.C.   At that time, Father was at Nova House.   MCCS sought temporary custody of the children, and a magistrate filed an ex parte order of interim custody on February 11, 2016. On February 17, 2016, after a hearing, the magistrate granted interim temporary custody to MCCS.

{¶ 4} On April 19, 2016, after a hearing, the magistrate adjudicated A.C. dependent and neglected and the other children dependent, neglected, and abused.   Father was not present for the hearing.   MCCS created a case plan for Mother; Father was not included as a participant on the case plan, as he was incarcerated in the Montgomery County Jail.

{¶ 5} On June 23, 2016, the magistrate held a dispositional hearing on MCCS's

motion for temporary custody. Mother was not present, although her counsel appeared and apparently agreed to temporary custody to MCCS; Father was incarcerated and had no attorney present. The same day, the magistrate granted temporary custody of the children to MCCS, and the trial court adopted the magistrate's ruling. Neither parent objected to the magistrate's decision.

{¶ 6} On June 29, 2016, the children were placed in a two-parent Angels Guarding Youth Services, Inc. Level One Treatment foster home. The children remained there together throughout the pendency of the case.

{¶ 7} In December 2016, MCCS moved for a first extension of temporary custody. After a hearing on January 10, 2017, the magistrate granted the motion, and the trial court adopted the magistrate's decision. In the order, the magistrate found that Father had not completed any case plan objectives, because he remained imprisoned.

{¶ 8} Father was released from prison on March 30, 2017, and, at his request, MCCS added him to the case plan as a participant. The case plan noted that Father was a recovering heroin addict, and that he and Mother were involved in a "domestic violence relationship." The case plan required Father to complete drug, alcohol, and mental health assessments and follow through with the recommendations; obtain and maintain safe and stable housing; obtain and maintain income; attend all visits with the children; agree to random drug screens; complete parenting classes; complete domestic violence classes; and sign releases of information.

{¶ 9} On June 22, 2017, MCCS filed a motion for a second extension of temporary custody.[1] The magistrate scheduled a trial on the matter for December 6, 2017. On

---

[1] This motion is not in the record. However, the trial court scheduled a hearing on the

October 19, 2017, prior to the trial on the motion for an extension of temporary custody, MCCS filed a motion for permanent custody of the children. At the December 6, 2017 trial, MCCS withdrew its motion for an extension of temporary custody and proceeded on its motion for permanent custody. Six witnesses testified at the trial: Father's probation officer, Mother's correctional caseworker at the Ohio Reformatory for Women, three caseworkers for the family, and Father. Mother's counsel was present, but Mother was incarcerated at the time of the hearing and did not appear.

{¶ 10} On December 20, 2017, the magistrate granted permanent custody of the children to MCCS. The magistrate found that the children had been in MCCS's temporary custody for 12 out of 22 consecutive months and that granting permanent custody to MCCS was in the children's best interest. Father and Mother filed separate objections to the magistrate's decision. On December 31, 2018, the trial court overruled the parents' objections and granted permanent custody of the three children to MCCS.

{¶ 11} Father appeals from the trial court's judgment.[2] In his sole assignment of error, he claims that the juvenile court erred when it granted permanent custody of the children to MCCS.

## II. Standards for Motion for Permanent Custody

{¶ 12} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody of a child to a public children services agency. The statute requires the court to find, by clear and convincing evidence, that:

motion before the magistrate, and the guardian ad litem filed a report in advance of the hearing.

[2] Mother has not appealed the trial court's judgment.

(1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22 month period. R.C. 2151.414(B)(1); *In re N.C.*, 2d Dist. Montgomery No. 26611, 2015-Ohio-2969, ¶ 13.

{¶ 13} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *See also In re N.C.* at ¶ 14. R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused

to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

{¶ 14} All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. A trial court's decision on termination of parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re L.J.*, 2d Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 15} Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.*, 2d Dist. Miami No. 2007-CA-35, 2008-Ohio-3485, ¶ 3.

{¶ 16} The trial court found, and Father does not dispute, that the children had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period preceding MCCS's motion for permanent custody, in accordance with R.C. 2151.414(B)(1)(d). Father's objections in the trial court and his arguments on appeal focus solely on the best interest analysis. Accordingly, we will confine our analysis to

whether the trial court erred in finding that granting permanent custody to MCCS was in the best interest of the children.

### III. Best Interest of the Children

{¶ 17} Father claims that the trial court's grant of permanent custody to MCCS was not in his children's best interest. He argues that he is attempting to work on his case plan – he is willing to follow through with his mental health assessment, he has a one bedroom apartment and could obtain a larger apartment if necessary, he could get employment immediately, he could complete parenting classes at Nova House, and that he is willing to "re-engage" with the visitation schedule. Fathers states that he "would go over and beyond what was expected of him if given more time to work his case plan."

{¶ 18} The relevant evidence at the December 2017 hearing on MCCS's motion for permanent custody was as follows[3]:

{¶ 19} Douglas Montgomery was the MCCS caseworker from October 2, 2015, until January 2017. Montgomery testified that MCCS received a referral regarding Mother's behavior with the children in October 2015 and a second referral in November 2015 after mother overdosed with the two youngest children nearby. Montgomery had spoken with Father, who was in the Montgomery County Jail, about placing the children with one of his family members. Father suggested his mother, but she was unable to care for the children. The children were placed with family friends pursuant to a safety plan with MCCS. In February 2016, MCCS moved for temporary custody of the children after the family friends indicated that they could no longer care for the children.

---

[3] Several witnesses discussed Mother's efforts to complete her case plan objectives and her behavior during the pendency of the case. Because this appeal concerns the termination of Father's parental rights, we will focus on Father's conduct.

{¶ 20} While Montgomery was the caseworker, Mother did not substantially complete any of her case plan objectives. Montgomery stated that Father initially did not have case plan objectives and goals due to his incarceration, and Father was to contact MCCS when he was released if he wanted to participate on the case plan. Father was in jail until January 2016, and he went to Nova House after his release and stayed until March 2016. Father communicated with Montgomery periodically but did not express interest in being added as a participant on the case plan. Montgomery stated that, other than Father's stay at Nova House, Montgomery did not know Father's whereabouts when Father was not incarcerated.

{¶ 21} In May 2016, Father pled guilty to possession of heroin, and he was sentenced to 11 months in prison (State's Exhibit 5); Father communicated with Montgomery and the children while in prison. Montgomery did not recall any visits between Father and the children in 2016.

{¶ 22} Dea Anna Buell was the caseworker between January 2017 and August 2017. When Buell took over the case, Mother was at Women's Recovery in Xenia. Mother "eloped" the program on February 19, 2017, and Buell next spoke with Mother on March 28, 2017, when Mother was incarcerated at the Montgomery County Jail. Mother remained incarcerated – at the jail and then the Ohio Reformatory for Women – for the duration of Buell's tenure as caseworker.

{¶ 23} Buell sent Father a letter in January 2017, asking his intentions regarding the children. Father called Buell in response. On March 30, 2017, Father was released from prison, and Buell met with Father at MCCS on April 4, 2017. The two discussed the case plan, and Father signed the case plan on April 12, 2017. Father's case plan

objectives were to complete drug, alcohol, and mental health assessments and follow through with the recommendations; obtain and maintain safe and stable housing with working utilities; obtain and maintain income sufficient to meet his and the children's needs; submit to random drug screens; complete parenting classes; complete domestic violence classes; and sign releases of information.

{¶ 24} Buell stated that, in April 2017, Father indicated that he planned to do roofing work with a friend's husband, but Buell was not able to verify employment. Father stated that he did not have documentation of verifiable income. Father initially resided in a hotel as part of a re-entry program, and he subsequently obtained an apartment. The apartment was appropriate, but Father put holes in the wall, at which point it became inappropriate. Buell stated that Father put holes in the wall due to paranoia about being watched. Father subsequently was "relocated" to another apartment at the end of Buell's tenure as the caseworker, but Buell did not have an opportunity to view the new apartment.

{¶ 25} Father completed a mental health and drug assessment at Nova House in June 2017. Nova House referred Father to a 28-day inpatient drug treatment program, Morningstar. Father began the Morningstar program in July 2017, but he left within a week due to a disagreement with staff over a pocketknife. For a time, Father went to South Community for mental health treatment and Recovery Works for drug treatment, but he discontinued South Community in the hopes that he could have a dual assessment at Recovery Works. Father went to Recovery Works for a few weeks, at which time he had a physical altercation with another man there; Father was suspended from the program while the matter was addressed. Buell testified that she never asked Father to

do a drug screen, because Father would tell her when he was using drugs; Father reported taking Suboxone once, heroin once, and methamphetamines several times. Father signed all the releases that Buell requested.

{¶ 26} Buell referred Father to Empower by Excellence for parenting classes, but Father did not follow through with the referral. Buell stated that Father was in jail when the class was to begin.

{¶ 27} Buell testified that Father visited inconsistently with his children between January 2017 and August 2017. Father was scheduled to meet with them for two hours on Thursdays, but he often did not show. In May 2017, Buell "put Father on a stipulation" that he arrive an hour early, but Father's visits remained inconsistent.

{¶ 28} Tanya Sheets became the family's caseworker in August 2017. Sheets stated that the children were still in their treatment foster home; the two younger children were having issues with violent behavior. Da.C., who was four years old in December 2017, attended a school that was half-education and half-mental health treatment. Do.C., then five years old, received counseling, and Sheets was attempting to arrange for an autism assessment for him. A.C., then ten years old, had an IEP for school and was receiving mental health services. The children were doing well in their foster placement.

{¶ 29} Sheets testified that Father sporadically visited with the children in August and September 2017; Father frequently was late for visitation. In late September 2017, Father was briefly incarcerated at the Montgomery County Jail as part of his sentence for the assault at Recovery Works. Sheets met with Father during visitation in October 2017 and at the MCCS lobby in November 2017, at which time Sheets told Father than MCCS

planned to move for permanent custody of the children. Father was upset by MCCS's intention to move for permanent custody, and he did not visit with the children after the November conversation. Father had a total of three visits with the children between August 2017, when Sheets became the caseworker, and December 6, 2017, the date of the hearing on the motion for permanent custody.

{¶ 30} When Sheets spoke with Father in September 2017, Father had no source of income. In October 2017, after his release from jail, Father told Sheets that he was going to re-engage in services to meet his case plan objectives, but he failed to do so. Sheets again referred Father to parenting classes, but he did not follow through. Sheets testified that, since her involvement with the family, Father had not been able to substantially complete his case plan objectives.

{¶ 31} Sheets testified that she had looked into placement of the children with other relatives or individuals, but none of the prospective placements was viable. Sheets considered the children to be adoptable, however the foster family was not interested in adoption. Sheets testified that several people involved with A.C.'s school had contacted MCCS regarding adopting the children. One of A.C.'s prior teachers expressed interest in adopting all three children; a school counselor had expressed interest in adopting A.C. Sheets stated that, if permanent custody were granted to MCCS, she would also turn in a referral to an adoption recruiter to find other matches for the children.

{¶ 32} Sheets testified that MCCS believed permanent custody was in the children's best interest. She stated that neither parent had substantially addressed his or her case plan objectives. There were ongoing substance abuse and mental health concerns, neither parent had stable income to provide for the children's needs, and there

were no known appropriate alternate placements for the children.

{¶ 33} Chantelle Jennings, chief probation officer for the City of Miamisburg, testified that Father was sentenced to probation on September 25, 2017, on an assault conviction (related to the altercation at Recovery Works). At the time of the hearing, Father was not in compliance with the terms of his probation, because he failed to report to his probation officer on October 24, 2017, and failed to respond to any correspondence, which was sent to his then-current address. Jennings testified that she spoke with Father as recently as the week before the hearing, and she told Father that she would have a warrant issued if he did not report; Father failed to report. Jennings stated there was an active warrant for the probation violation, and Father faced a potential 150 days in jail. Jennings stated that she would be arresting Father at the conclusion of the hearing.

{¶ 34} The guardian ad litem recommended permanent custody to MCCS. Her report, which was admitted into evidence, expressed her concern that both parents had heroin addiction issues and criminal activity. With respect to Father, she was concerned that Father's participation had been limited and inconsistent. She indicated that she had had difficulty communicating with Father; he did not respond to written communications and initially claimed it was a wrong number when the guardian ad litem tried to reach him by phone. She wrote, "Father sounded disoriented and unstable on the phone and frequently rambled strangely, mumbled and then just wandered off."

{¶ 35} The guardian ad litem indicated that the children "have fluctuated in their wishes. As of the last meeting with each child, none wanted to return home. The youngest was not sure he even wanted to visit with father anymore."

{¶ 36} Father testified that he disagreed with MCCS's request for permanent custody. He stated that he "wholeheartedly" was willing to work on his case plan and that he was attempting to complete the objectives. Father stated that he was scheduled to return for mental health treatment the following day, and that he returned to Morningstar for drug and alcohol treatment; he testified that he had arrangements with Recovery Works for after care treatment. Father stated that his housing was "secure"; he had a one bedroom apartment, but could get a larger apartment if needed. Father admitted that he had not been looking for work, but he stated that he could find work "immediately." Father stated that "transportation is the key for me." Father testified that he could complete the parenting objective of his case plan at Nova House. Father acknowledged that he had missed visitations, but stated that "it's hard for me to leave my kids there." Father stated that he had had video-chats with his children when they were at the foster home, as recently as the Thursday before the hearing.

{¶ 37} Based on the evidence presented at the December 2017 hearing, the trial court concluded that permanent custody to MCCS was in the children's best interest. With respect to Father, the trial court reasoned:

Father has also failed to make significant progress on his case plan objectives. Father first made contact with the Agency in January 2016. However, it was not until April 2017 that Father actively began working on his case plan. Father alleges that he could gain employment at any time, but has failed to provide any verifiable income throughout the life of the case. Father has also been unable to demonstrate stable and adequate housing. Following a period of incarceration, Father obtained an

apartment through a re-entry program in April 2017. However, not long after, Father's housing was deemed inappropriate for the children after Father put holes in the wall due to paranoia that he was being watched. Father subsequently moved from that residence and MCCS has been unable to verify the adequacy of any other housing.

Father attempted substance abuse treatment on various occasions. Father engaged in treatment through Morningstar in July 2017, but disengaged after a disagreement over a pocketknife. Father then entered Recovery Works. However, Father's progress was halted after he was arrested for assaulting another man on the Recovery Works property. Father was sentenced to 2 years of probation as a result of that incident. At the time of the hearing, Father was non-compliant with the terms of his probation.

Father has failed to consistently visit with the children. Although Father would ask caseworkers about the children and send letters, Father did not visit the children from January 2016 through April 2017. Once Father began visitation in April 2017, he was frequently late or would miss visits altogether. The active caseworker testified that Father visited the children only 3 times between August 2017 and December 2017. Father ceased all communication with the Agency in November 2017.

Father has failed to demonstrate an ability to care for the children in the foreseeable future due to his repeated incarceration, ongoing substance abuse and mental health issues, and lack of adequate housing or income.

Further, Father has failed to consistently visit with the children. The trial court found that there were no willing or able relatives available as a potential placement for the children, that MCCS's permanency plan was for adoption, that the children were adoptable, and that individuals at A.C.'s school had expressed interest in adopting the children. The court noted that the guardian ad litem recommended permanent custody to MCCS.

{¶ 38} Upon review of the record, the trial court's determination that permanent custody to MCCS was in the best interest of the children was supported by clear and convincing evidence. We find no error in the trial court's determination to grant custody to MCCS.

{¶ 39} Father's assignment of error is overruled.

### IV. Conclusion

{¶ 40} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Sarah E. Hutnik
Robert Alan Brenner
Michael Brush
Sara M. Barry
Dawn Garrett
Hon. Helen Wallace